(No. 11951.—Judgment affirmed.)

THE PEOPLE *ex rel.* Charles H. Redman, Appellant, *vs.* THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS *et al.* Appellees.

*Opinion filed April 17, 1918—Rehearing denied June 5, 1918.*

1. SCHOOLS—*the University of Illinois is a public institution of the State.*  The University of Illinois is a public institution of the State, and the State may, through other agents than the trustees, sell the property of the institution and may amend or repeal its charter, and the income provided by the State for the university belongs to the State.

2. CIVIL SERVICE—*employees of the University of Illinois, except teachers and professors, are under the State civil service.*  The employees of the University of Illinois, except the professors, instructors and teachers and others specified in section 11 of the Civil Service act, are employees of the State under the Civil Service Commission.

3. SAME—*the courts cannot question legislative classification of employees in civil service.*  The only sound basis for civil service laws is to increase the efficiency of public service, and the question whether the classification of employees in such laws is wise or unwise is for the legislature and not for the courts.

4. SAME—*a carpenter is not a "laborer" within the meaning of section 12 of the Civil Service act.*  In section 12 of the Civil Service act the word "laborer" is used as meaning an ordinary laborer or day workman and not a skilled artisan, such as a carpenter.

5. SAME—*mandamus petition to compel the payment of salary must allege existence of a fund from which payment can be made.*  To compel the State Auditor or State Treasurer, by a petition for

*mandamus,* to pay the salary of a State employee the petition must allege facts from which it can be fairly inferred that there is a specific fund from which such money can be drawn.

6. APPROPRIATIONS—*courts take judicial notice of legislative appropriations.* Courts will take judicial notice of legislative appropriations, as they are public laws.

7. SAME—*appropriation in 1917 for University of Illinois was for prospective obligations.* The legislative appropriation in 1917 for the University of Illinois for "two years beginning July 1, 1917, and until the expiration of the first fiscal quarter after the adjournment of the next General Assembly," was for prospective obligations and not to pay those previously incurred.    \

8. CONSTRUCTION—*words not used in technical sense should be construed according to popular meaning.* A word having a technical as well as a popular meaning should ordinarily be construed according to its popular signification and meaning, unless the very nature of the subject indicates or the context suggests that it is used in a technical sense.

APPEAL from the Circuit Court of Champaign county; the Hon. FRANKLIN H. BOGGS, Judge, presiding.

GREEN & PALMER, (ORIS BARTH, of counsel,) for appellant.

EDWARD J. BRUNDAGE, Attorney General, and O. A. HARKER, (CLARENCE N. BOORD, of counsel,) for appellees.

Mr. CHIEF JUSTICE CARTER delivered the opinion of the court:

At the September term, 1917, of the circuit court of Champaign county a petition for *mandamus* was filed on the relation of Charles H. Redman to compel the board of trustees of the University of Illinois to cause to be drawn a pay-roll or account containing the name of Redman for five months' salary as a civil service employee doing carpenter work at said university, and to require said board to file said pay-roll or account with the State Civil Service Commission; that said commission be required to approve

said pay-roll and certify thereon that Redman was entitled to said pay, and to file the said certified account or pay-roll with the Auditor of Public Accounts and to present to said Auditor itemized vouchers for compensation for the pay of Redman, and that said Auditor and the State Treasurer be required to draw a warrant and to pay the same to the relator. All the defendants entered their appearance and general demurrers were filed in their behalf. The trial court sustained these demurrers and dismissed the petition. From that order an appeal was perfected to this court.

From the allegations in the petition it appears that in July, 1915, Redman took an examination for the position of carpenter at the University of Illinois in pursuance of the provisions of the State Civil Service act; that he passed the examination and was placed upon the list of those eligible to the position of carpenter for said university and was duly certified by the State Civil Service Commission for that position at a salary to be paid by said university of not less than $60 a month; that in September, 1915, he began work under said appointment of the State Civil Service Commission and by an arrangement with the authorities of said university he was to be paid monthly at the rate of $3.60 per day (forty cents per hour for nine hours a day) with an employment of six days each week; that he continued in such employment until December 27, 1916, when he was informed by his foreman that he was laid off; that he reported thereafter numerous times for work and requested and offered to go to work but was refused; that the authorities of the university did not report the attempted lay-off or discharge to the State Civil Service Commission, but about January 15, 1917, reported to said commission that Redman would probably be re-employed in the near future, as it was expected there would be work available of the type which he could handle; that shortly thereafter the university authorities made requisition on the State Civil Service Commission for carpenters, and on February 2 said

commission certified two other persons to the university to act in that capacity; that at no time were there any written charges filed to remove or discharge the relator, nor was the commission notified that it was necessary to reduce the number of carpenters at the university under said civil service or the number of the employees to be laid off. The petition further alleges that thereafter the university authorities, after reporting to the commission that they intended to put Redman back to work and after receiving the certification of other persons for employment as carpenters at the university, reported to the commission in March, 1917, that the relator had been laid off because of inefficiency, physical unfitness and inattention to the instructions of his foreman; that the commission thereupon notified the university authorities to either prefer charges against the relator or to alter the record made concerning the reason for his lay-off, and this they refused to do, claiming the right to discharge Redman; that in June, 1917, the university authorities notified Redman to report for work on June 28; that on that date he appeared at his working place and stated that he was ready to go to work but wanted some understanding about his back pay, and the foreman stated that he would not discuss that question; that the matter was then taken up with the acting comptroller of the university, and Redman was notified that the university was under no obligation whatever to him. The petition further alleges that Redman had received no pay whatever from the time he was laid off on December 27, 1916, to June 28, 1917, and that he was entitled to pay for services as carpenter at the rate at which he was employed, for the time between those two dates. The petition conceded that under section 12 of the State Civil Service law the university authorities were authorized to suspend Redman for a period not exceeding thirty days, and that therefore he was entitled to pay for five months and not six months, the time he was out of employment.

283 – 32

Special counsel appearing for the State university authorities argue earnestly and at length that the employees of the university are not employees of the State of Illinois under the provisions of the State Civil Service act. Section 3 of the State Civil Service act in force the first six months of 1917 provides, among other things, that the State Civil Service Commission shall, within six months after the act goes into effect, classify all offices and places of employment in the State service, except as provided in section 11 of the act, with reference to the duties thereof, for the purpose of establishing grades and for the purpose of fixing and maintaining standards of examinations hereinafter provided for; that such classification shall include all offices and places of employment now in existence or which may hereafter be created in the State service of the State of Illinois, except those expressly exempted from the operation of the act in section 11 thereof. (Hurd's Stat. 1916, p. 563.) Section 11 of the same act specifically exempts the president, professors, instructors and other teachers in the University of Illinois.

Counsel who appeared for the university, in his oral argument before the court, conceded that the Illinois legislature had authority to place all the employees of the University of Illinois under civil service, and that the only question was whether the legislature intended, under the State Civil Service act, to require the employees of the university to be under civil service. The argument of counsel is to the effect that a large amount of land was granted by the United States government for the benefit of the university in 1862, and that in 1881, and thereafter, appropriations have been made and increased from time to time by the Federal government; that they now aggregate approximately $100,000 annually, and are expended by the board of trustees of the university without control or attempted control by the State authorities, this appropriation being controlled by said trustees, and that the question here un-

der consideration is to be decided upon the basis whether the employees of the university are in State service or in the service of the board of trustees.

This court has decided that although the State has created a body corporate to control the Illinois Industrial University and its property and affairs, yet the State still retains the power of appointing its trustees, and may, through other agents than the trustees, sell and dispose of the property of the institution or amend or repeal the charter, as public policy or the interest of the university may require. (*Board of Trustees* v. *Champaign County,* 76 Ill. 184.) It has also been held that the income provided by the State for the university belongs to the State, (*Thomas* v. *Industrial University,* 71 Ill. 310,) and that the university is a public institution of the State. *Spalding* v. *People,* 172 Ill. 40.

It is true, as argued by counsel for the university, that the mere placing of certain employees of the university in the excepted class does not necessarily prove that the legislature intended to put the other employees under State civil service. In order to obtain the true intent of the legislature upon this question it is necessary to consider section 3 in connection with section 11 and all the other provisions of the act. In construing a certain provision of a statute the whole act should be considered, since the words and meaning of one part may furnish an explanation of another. (*Maiss* v. *Metropolitan Amusement Ass'n,* 241 Ill. 177; *People* v. *Giles,* 268 id. 406.) Reading these two sections together, in connection with the rest of the act, it seems clear that the legislature considered that the employees of the university were State employees, otherwise there would have been no necessity to place the exception in section 11 as to the teachers and professors. Moreover, section 3 refers specifically to section 11, so that it is absolutely essential to read section 11 in connection with section 3 to understand the intention of the legislature as to who are to be considered State employees. Reading these sections and the

entire act together we cannot escape the conclusion that the legislature considered the employees of the university as State employees and to be under the Civil Service act, except as provided in section 11.

The Attorney General argues that under the allegations of this petition Redman cannot be considered as holding a permanent place or position under the State Civil Service act, but that such act should be construed as making his employment one in which wages will be fixed and agreed upon by contract between him and the employing department; that in this latter class it is clear, under a fair construction of the statute, workmen and laborers should be included whose positions and salaries are not prescribed in or by the law. He argues that this conclusion should be reached as to Redman in the class of work he is doing under the provisions of section 12 of the State Civil Service law, which provides that "no officer or employee in the classified civil service shall be removed or discharged except for cause, upon written charges," but that "nothing in this section shall be construed to require such charges in case of laborers," etc. The petition alleges that Redman took an examination as a carpenter and was certified to the university authorities as a "carpenter" and not as a "common laborer." He further argues that a carpenter is certainly a laborer, and that therefore no written charges of any kind were necessary to dismiss him from his employment, and that the university authorities had a right to dismiss him as a laborer without referring the matter to the State Civil Service Commission. Whether this is true or not depends upon the specific meaning that should be given to the word "laborers" in said section 12. "Laborer" is defined as "one who does physical labor; one who works at a toilsome occupation; especially a person who does work that would require strength rather than skill, as distinguished from artisans and from the professional classes; a person who performs labor of any kind." (Webster's

New Inter. Dict.; Century Dict.)· "No doubt the term 'laborer,' in some extended senses, will include every possible human exertion, mental and physical." (*Brockway* v. *Innes,* 39 Mich. 47.) Popularly speaking, the term "laborer" is not applicable to anyone who does not earn his living by the work of his hands. (*Caraker* v. *Matthews,* 25 Ga. 571.) The meaning of the word "laborer" has been more often defined with reference to the enforcement of mechanic's lien and workmen's compensation laws than perhaps in any other connection. A time-keeper, an architect, an engineer, the overseer of a plantation, a consulting engineer, the assistant chief engineer of a railroad, a traveling salesman, an agent who sells goods by sample, a railroad conductor, a contractor, a book-keeper and a general manager have all been decided at various times not to be laborers within the terms and meaning of certain laws. (2 McQuillin on Mun. Corp. 955, and cases cited in note 53.) See, also, for illustrations of the meaning of "laborer" under various statutes, the decisions in 5 Words and Phrases, 3952-3968, inclusive; 2 id. (2d series) 1322-1326, inclusive; 2 Stroud's Judicial Dict. 1049; 24 Cyc. 810, and cases cited. In construing the English Workmen's Compensation law it was said: "A carpenter or a bailiff or a parish clerk is not called a laborer. A 'laborer' is a man who digs and does other work of that kind with his hands. A 'journeyman' is a man who is working for a master, such as a carpenter. An 'artificer' is a skilled workman, and a 'handicraftsman' is the same." *Morgan* v. *London General Omnibus Co.* 53 L. J. (N. S.) 352.

Manifestly, from a reading of these various decisions defining "laborer," the meaning of the term depends very largely upon the intent of a statute and the connection in which the word is used in such statute. Section 6 of the State Civil Service law, which refers to examinations to be held for classified civil service, provides, among other things, that the examination is to be free to all citizens of

the State for any position or place, "with limitations speci-
fied in the rules of the commission as to residence, age, sex,
health, habits, moral character and qualifications to perform
the duties of the office or place to be filled, which quali-
fications shall be prescribed by rule in advance of such ex-
amination : *Provided, however,* that in examinations for
technical positions residence may be waived. Such exami-
nations shall be practical in their character, and shall relate
to those matters which will fairly test the relative capac-
ity of the persons examined to discharge the duties of the
position to which they seek to be appointed, and may include
tests of physical qualifications and health, and when appro-
priate, of manual skill." It may be, as argued by counsel
for the State, that to attempt to classify carpenters, brick-
layers, masons, painters, ditch diggers, orchard men and
farm laborers in the various departments of State employ-
ment is most unwise and detrimental and tends very greatly
to destroy the beneficial results sought by the Civil Service
law. Necessarily the only sound basis for such laws is to
increase the efficiency of public service. (*People* v. *McCul-
lough,* 254 Ill. 9; *People* v. *Stevenson,* 270 id. 569.) But
this court has held in the decisions last cited that the legis-
lature had the authority to place the State employees under
civil service. This being so, the question whether such laws
are wise or unwise is for the legislature and not for the
courts. (*People* v. *Dunne,* 258 Ill. 441; *People* v. *Henning
Co.* 260 id. 554.) In discussing civil service laws, their
constitutionality and proper construction, Dillon, in the last
edition of his great work on municipal corporations, states
(vol. 1, 5th ed. sec. 405) : "In contradistinction to the
heads of departments, ordinary laborers or day workmen
are not required to pass competitive examinations. Simi-
larly, statutes which prohibit the discharge of persons hold-
ing positions by appointment in the municipal service except
for cause and after notice and a hearing, or otherwise re-
strict the power of removal, are by their terms usually con-

strued to have no applicability or operation upon laborers or day workmen." (See authorities and discussions cited in notes 1 and 2 to this section.) We think it can be fairly assumed that the legislature had in mind the general meaning and signification of the word "laborer" when it inserted that word in section 12 of this statute. A word having a technical as well as a popular meaning should ordinarly be construed according to its popular signification and meaning, unless the very nature of the subject indicates or the context suggests that it is used in a technical sense. (2 Lewis' Sutherland on Stat. Const.—2d ed.—secs. 390, 394.) In our judgment the legislature used the word "laborer" in section 12 of this statute as meaning an ordinary laborer or day workman and not a skilled artisan. We think, in the popular signification of the word, a carpenter is generally understood to be a skilled laborer rather than an ordinary day laborer.

The Attorney General further argues that the petition in this case does not state or show that there was at the time of filing said petition any appropriation against which it was the duty of the Auditor to draw his warrant and out of which it was the duty of the Treasurer to pay the sum claimed by the petitioner. Under section 17 of article 4 of the constitution of 1870 it is provided that no money shall be drawn from the treasury except in pursuance of an appropriation made by law and on the presentation of a warrant issued by the Auditor thereon, and no money shall be diverted from any appropriation for any purpose other than that for which it was appropriated. Before mandamusing the State Auditor or State Treasurer, as prayed for in this petition, there must be sufficient funds alleged in said petition to show that they are under legal obligations or duty to perform the required act. (High on Ex. Legal Remedies,—3d ed.—secs. 114, 117; *Stevens* v. *Truman,* 127 Cal. 155.) The petition is defective if it does not allege facts from which it can be fairly inferred that there is a specific

fund from which such money can be drawn. (*Commissioners* v. *State,* 42 Kan. 327; *People* v. *Stevenson, supra.*) In the laws of 1917, on page 199, there is an appropriation "to the University of Illinois for the two years beginning July 1, 1917, and until the expiration of the first fiscal quarter after the adjournment of the next General Assembly," for its use and maintenance, a part to be used for salaries and a part of it for reserve funds and contingencies.

It seems to be conceded by counsel for appellant that the appropriations made by the State legislature for the University of Illinois for the years 1915 and 1916 have lapsed, but it is argued that under a fair construction of this appropriation and the decisions bearing on this question the legislature's intention as to this appropriation was to make it "for the use of the university for the two years beginning July 1, 1917, to enable it to pay all its just debts." The courts will take judicial notice of the legislative appropriations, as they are public laws. (*People* v. *Brown,* 281 Ill. 390.) Under a reasonable construction of the constitution and the decisions of this court bearing on that question we do not think this appropriation for 1917 should be construed as contended for by counsel for appellant. It was clearly intended, in our judgment, that the appropriations made for the 1915-16 period should take care of all obligations, including salaries and contracts, until the expiration of the first fiscal quarter after the appropriation was made, and that this appropriation for 1917 was made as to prospective obligations and not those that had been incurred in the past, otherwise the main purpose of the constitutional provision as to appropriations being made before obligations are incurred would be practically defeated. For this reason, if for no other, we think the decision of the trial court was correct.

The judgment of the circuit court of Champaign county will therefore be affirmed.                    *Judgment affirmed.*