(No. 26947.—

THE PEOPLE *ex rel.* The Board of Trustees of the University of Illinois *et al.,* Petitioners, *vs.* GEORGE F. BARRETT, Attorney General, *et al.,* Respondents.

*Opinion filed January 21, 1943—Rehearing denied March 11, 1943.*

BARNABAS F. SEARS, and CHARLES F. SHORT, JR., for petitioners.

GEORGE F. BARRETT, Attorney General, (WILLIAM C. WINES, of counsel,) for respondents.

Mr. JUSTICE SMITH delivered the opinion of the court:

This is an original petition for *mandamus*. The relators are the Board of Trustees of the University of Illi-

nois and Norval D. Hodges and Sveinbjorn Johnson, individually. Hodges and Johnson are alleged to be employees of the university. The action is brought against the Attorney General and the Auditor of Public Accounts of the State of Illinois. Its purpose is to compel the payment of salaries alleged to be due to the individual relators; to prevent the Attorney General from interfering with Johnson and Hodges acting as counsel and assistant counsel, respectively, for the university and its Board of Trustees, and from interfering with them in the exercise of the asserted right to represent the Board of Trustees in a case now pending in the circuit court of Cook county.

Respondents appeared and filed an answer. With the consent of the parties, the answer was ordered to stand as a demurrer to the petition. The cause has been submitted on the petition and the answer thereto, treated as a demurrer, and upon briefs and oral arguments. On this state of the pleadings the facts well pleaded in the petition, as distinguished from conclusions of the pleader, must be taken as true.

The petition contains forty-five paragraphs. It is divided into seven divisions. For convenience these divisions will be followed in analyzing the averments of the petition.

The first division describes generally the organization and history of the university; its functions as an educational institution and its relationship, through membership in the North Central Association of Colleges and Secondary Schools, with other educational institutions. It is averred that the university was created by an act of the legislature in 1867, and has existed and operated under that act and supplemental and amending acts since that time; that it is a public tax-supported institution offering instruction in liberal arts and sciences, agriculture, mechanical arts and military science; that it operates various colleges and schools specializing in certain general and professional fields, such as Colleges of Law, Medicine and Dentistry, the Schools of Journalism, Physical Education and Graduate Studies;

that the governing body of the university since its inception has been the Board of Trustees; that the trustees have power to adopt rules and bylaws, elect officers, prescribe the duties of its officers, and act generally as the policy-forming body of the university; that the board also is empowered to elect a President of the University, who acts as the executive agent of the board.

It is further alleged that the board has divided the university into various schools, colleges and departments, each administered by an officer designated as Director, Dean or Head of such department. For the purpose of providing instruction it is alleged that the board employs more than one thousand professors, associate professors, assistant professors, instructors and assistants; that full professors are hired on a permanent basis, and their employment can be terminated only by retirement, resignation, or discharge for cause after a full hearing before the board; that this plan is in conformity with the practice followed by similar educational institutions of higher learning, throughout the country.

The board has created an organization known as the University Senate, composed of full professors, the president, and certain other staff members. This group deals solely with problems of internal administration and educational policy, and recommends rules and regulations for adoption by the board. The rules and regulations, when adopted by the board, become the University Statutes and are binding upon the administrative agents, staff members and employees of the university; they deal with the organization of the schools, colleges and departments, terms of employment, policies regarding patents and research, student loans, gifts and trust funds, and any other matter which has to do with carrying out the general policies of the board.

It is averred that the board holds and administers trust funds for endowment and other purposes, including student loan funds of approximately $359,000; that pursuant to

power granted by its charter, the board enters into contracts with its staff members, both teachers and administrative workers. The petition alleges the necessity for competing with other educational institutions in the securing of competent staff members. It also describes the accrediting system whereby the members of the North Central Association are constantly supervised and given accredited ratings only if they maintain certain standards of effectiveness as educational institutions; that in the interests of the citizens of the State it is imperative that the university retain its standing as an accredited institution; that in order to meet the requirements of the North Central Association for accredited status, it is necessary that the board alone shall have the responsibility for the employment or removal of the university staff members, and that no outside person or official shall have the right to order the dismissal of one of the staff members of the institution.

The second division of the petition relates to the position of relator Hodges. It is alleged that Hodges was hired in September, 1941, as Student Loan Assistant in the Bursar's Division of the Business Office, at a salary of $2100 per year; that Hodges, who is an attorney, was also given the title of Assistant University Counsel, with an additional salary of $900 per year; that $2100 of his annual salary is paid out of the student loan funds and $900 from the State appropriation for the University; that Hodges' duties are to assist in the administration of the student loan fund, and to supervise and assist in the collection and adjustment of loans; that the University Counsel, under the rules of the board, is ultimately responsible for the collection of the loans, but that Hodges performs most of the actual work in connection with the administration of the loan funds.

It is alleged that inasmuch as the student loan funds represent gifts from many individuals, and the board acts as trustee of these funds, it is imperative that the board

alone control the hiring and firing of the staff members charged with the duty of administering the funds.

The third division describes the duties of relator Johnson. Johnson became a member of the university staff in 1926, as Professor of Law and Legal Counsel, succeeding the late Judge O. A. Harker in the latter position; that his title was changed in 1931, and in September, 1941, Johnson was designated in his written contract with the board as Professor of Law and University Counsel, at a salary of $9000 per year; that no apportionment of his compensation was made between his duties as professor and counsel; that the business office has since certified payroll vouchers to the Auditor of Public Accounts under the designation of "Sveinbjorn Johnson, Professor and Counsel." Johnson's duties as Professor of Law consist in teaching such courses in the College of Law as may be assigned to him, consulting with students, and supervising the preparation of law review notes. As University Counsel, his duties include preparing and checking legislative bills which affect the University, counseling with the president on administrative problems of mixed law and fact, collecting delinquent student loans and representing the board when requested. His primary status, however, is alleged to be professorial.

The fourth division is devoted to an exposition of the duties and activities, professorial and administrative, required by the board of many of the staff members of the university. For example, the Director of the Library is also the Director of the Library School and Professor of Library Science, the Provost of the University is also dean of one of the colleges and the Dean of the College of Medicine is head of the Department of Bacteriology, Pathology and Public Health and Professor of Pathology. Some staff members hold titles with other State and Federal departments; a Professor of Chemistry is, for example, Director of the State Water Survey and paid by the State

Department of Registration and Education, whereas, the Dean of the College of Agriculture is also Director of the Extension Service. For his services in connection with the extension service he is paid with Federal funds.

Since 1906, the board has appointed one of the professors of law as Legal Counsel, or University Counsel. Johnson has held this position since 1926. His salary is paid by payroll vouchers certified to the Auditor of Public Accounts showing that he is employed as "Professor and Counsel." Other members of the College of Law faculty are also called upon for technical services, such as serving on the University Civil Service Committee, Committee on Accountancy, and University Retirement Committee. Johnson serves as secretary of the Committee on Patents, and in so utilizing his ability the board is merely following the procedure commonly adopted in university administration in other colleges.

In the fifth division the events leading up to the present action are set forth. It is alleged that during 1941 and 1942 the Attorney General suggested from time to time that he should select the counsel for the board. The board discussed the question at a meeting held April 22, 1942, at which time it took no action but informally indicated that it was satisfied with Johnson. On the same day the Attorney General wrote Johnson a letter purporting to accept his resignation as Assistant Attorney General and University Counsel. It is alleged that no such resignation had been submitted by Johnson. On May 7, 1942, the Attorney General advised the board and the President of the University by letter, that he had accepted the resignation of Hodges as assistant to the University Counsel, and Johnson as Assistant Attorney General and University Counsel. Also, on May 7, 1942, the Attorney General advised the Auditor of Public Accounts of the purported resignations, and directed the Auditor to cease issuing salary warrants to Johnson and Hodges as counsel and assistant counsel

for the university. It is alleged that the Attorney General has never certified the names of Johnson and Hodges to the Auditor of Public Accounts, on his payroll for salary warrants, and that the only payroll vouchers on which their names have appeared were those certified by the University of Illinois. It is also asserted that the Attorney General has no power to ask for, or to accept, if tendered, the resignation of any member of the university staff.

On May 29, 1942, the Auditor of Public Accounts informed the Comptroller of the University that in accordance with the request of the Attorney General it would be necessary for him to withhold the warrants payable to Johnson and Hodges. Since that time it is alleged that the Auditor has refused to issue or deliver any salary warrants to either Johnson or Hodges, although requested to do so and although the Comptroller of the University has duly certified payroll vouchers for both, each month; that the Auditor has also withheld a warrant for $8.40 payable to Johnson for expenses, since August 13, 1942.

The board met on May 16, 1942, and authorized the continued drawing of vouchers payable to Johnson and Hodges. At a meeting of the board held June 20, 1942, Johnson was appointed Professor of Law and University Counsel and Hodges was appointed Assistant University Counsel for the academic year 1942-43, at the same salaries which they had theretofore received. On August 18, 1942, a petition for *mandamus* against the university and the board was filed in the circuit court of Cook county, by one Earl Zarzove. The President of the University as agent for the board, directed Johnson to appear as counsel for the defendants and to prepare and file an answer in the cause. Johnson filed an answer in which he set up the justification for the action of the university in refusing to admit Zarzove. This answer was filed on August 24, 1942. On August 28, 1942, the Attorney General filed a motion to strike the answer filed by Johnson, on the grounds that

the Attorney General and not Johnson, was the legal representative of the university and the board, and that Johnson's appearance and answer were unauthorized.

On August 29, 1942, the board met and formally ratified the action of the president directing Johnson to appear as counsel for the university and board, in that cause. The board has never authorized the Attorney General to appear for them in said cause. The motion of the Attorney General in that case was filed after the return day of the summons. It is alleged that if Johnson had not filed an answer, the university would have been defaulted and convicted of racial prejudice, and would have lost its accredited standing, to the detriment of the people of the State of Illinois. It is not alleged that the Attorney General was ever notified by the university or the board of the pendency of said suit or the service of process on either of them.

The sixth division of the petition deals with the practice of former Attorneys General. It alleges that such former Attorneys General recognized the position of University Counsel and its occupant as the proper representative of the university and the board. Copies of letters from three former Attorneys General, addressed to Johnson, are set out, in each of which his position as legal advisor to the university is alleged to have been recognized. The petition refers to numerous cases since the organization of the university in 1867, in which the Board has been represented by counsel other than the Attorney General. It is further alleged that since 1906, when the position of Legal Counsel was created, the salary for that position has appeared annually in the internal budget of the University and biennially in the report of the board to the Governor. It is alleged that such report is also distributed to members of the General Assembly and that the General Assembly bases its appropriations for the University upon such report.

The seventh and final division of the petition alleges that the attempt of the Attorney General and the Auditor of Public Accounts to remove Hodges and Johnson from the staff of the university against the will of the board is an infringement of the rights of the board, menaces its independence as a public corporation, and operates to deny to relators due process of law. It alleges that the conduct of the Attorney General and Auditor is in violation of sections 1 and 2 of article II of the constitution of the State of Illinois, and of the fourteenth amendment to the constitution of the United States.

The petition is replete with statements with reference to the practice in other departments of the university, with comparative averments as to the division of time between two or more departments or activities of the same employee in other departments or branches of the professorial staff, executives, assistants, administrative agents and employees. In many respects the petition is redundant with conclusions and argumentative statements which, in no sense, constitute the averment of facts admitted by the answer when treated as a demurrer or motion to dismiss. We have above set out all the material facts well pleaded and upon which facts the issues of law are framed.

The prayer for relief is that a writ of *mandamus* issue directing the Attorney General to rescind his order to the Auditor of Public Accounts advising him that no warrants may be lawfully issued in payment of compensation to Johnson and Hodges, and like orders to the President and Board of Trustees of the University; that the Attorney General be directed to withdraw and dismiss his "Motion to Strike Purported Appearance and Answer" in the Zarzove case; and that the Auditor of Public Accounts be ordered to issue warrants in favor of petitioners for their salaries accrued at the time the petition was filed. There is also a prayer for general relief.

The decisive question is whether the Attorney General is, by virtue of his office, and in his official capacity, the sole legal advisor, counsel and attorney for the university and its Board of Trustees. The solution of this question involves a determination of the status of the university as a corporate entity and its relation to the State government, as well as the powers vested in the Attorney General by the constitution and laws of this State.

By an act of July 2, 1862, (12 Stat. 503; 7 U. S. C. A. sec. 301 *et seq.*) the Congress of the United States made certain land grants to· the several States for the endowment, support and maintenance of at least one college in each State, where the leading object should be to teach such branches of learning as are related to agriculture and the mechanic arts. It was further provided that the enumeration of these subjects as the leading purpose and object of such colleges should not exclude the teaching of other scientific and classical studies and military tactics.

That it was the purpose and intention of the Congress that the title to the land granted should vest in the several States for the maintenance of such colleges is clear from the language used in section 1 of the act, which reads: "There is granted to the several States, for the purposes hereinafter mentioned in sections 302 and 308, inclusive, of this chapter, an amount of public land, to be apportioned to each State a quantity equal to thirty thousand acres for each Senator and Representative in Congress to which the States are respectively entitled by the apportionment under the census of 1860."

Section 2 of said act provides for the apportionment of the lands granted among the several States. It further provides that the lands granted and apportioned to each State shall be selected from the public lands located within such State, subject to sale by private entry. It further provides that where the quantity of public lands available within any State, subject to sale by private entry, is not

sufficient to fill the quantity of land apportioned to such State, land scrip in the amount in acres of the deficiency in its distributive share shall be issued and delivered to the State. It is further provided that no State shall be authorized to select lands under the grant which are located outside its own boundaries. The States were, however, authorized to assign the land scrip issued to them, and the assignees were authorized to locate and acquire lands with no restrictions as to the State in which such lands were located.

Section 4 of the act provides that all moneys arising from the sale of lands and from land scrip shall be invested and shall forever thereafter constitute a perpetual fund, the capital of which shall forever remain undiminished; that the interest arising from such funds shall be inviolably appropriated and be used for the endowment, support and maintenance of such college or colleges.

Section 5 imposed seven conditions upon which the grant to each State was made, as follows: First—If any portion of the fund invested, or the interest thereon, shall by any action or contingency be diminished or lost, it shall be replaced by the State to which it belongs, so that the capital of the fund shall remain forever undiminished; and the annual interest shall be regularly applied without diminution for the purposes mentioned in section 4. Second—No portion of the fund, or the interest thereon, shall be applied directly or indirectly for the purpose of erection, preservation or repair of any building or buildings. Third—Any State claiming the benefit of the provisions of the grant shall provide within five years from the date of its acceptance not less than one college to be endowed under the act. Fourth—Each State is required to make an annual report regarding the progress of each college, showing any improvements and experiments made, with the costs and results and certain other economical statistics. Copies of this report are to be submitted to all the other

colleges which may be endowed under the act, and one copy must be mailed to the Secretary of Interior. Fifth—When lands are selected from those which had been raised to double the minimum price, in consequence of railroad grants, they were required to be computed to the States at the maximum price, and the number of acres proportionally diminished. Sixth—No State, while in a condition of rebellion or insurrection against the Government of the United States, shall be entitled to the benefits of the act. Seventh—In order for a State to be entitled to the benefits of the act, it was required to express the acceptance thereof through its legislature within three years from July 22, 1866.

By subsequent legislation, Congress has made substantial annual appropriations for the more complete endowment and maintenance of colleges for the benefit of agriculture and the mechanic arts, established in accordance with the provisions of the act of July 2, 1862. These appropriations are also made to the State. 7 U. S. C.A. 322.

In compliance with these conditions the legislature on February 28, 1867, passed an act creating a corporation to be styled "The Board of Trustees of the Illinois Industrial University.". Laws of 1867, p. 123; Ill. Rev. Stat. 1941, chap. 144, par. 22.

By section 1 of this act, a corporate entity was created and its powers defined, as follows: "That it shall be the duty of the Governor of this State within ten days from the passage of this act, to appoint five trustees, resident in each of the judicial grand divisions of this state, who, together with one additional trustee, resident in each of the congressional districts of this state, to be appointed in like manner, with their associates and successors, shall be a body corporate and politic to be styled 'The Board of Trustees of the Illinois Industrial University;' and by that name and style shall have perpetual succession, have power to contract and be contracted with, to sue and be sued, to plead and be impleaded, to acquire, hold, and convey real

and personal property; to have and use a common seal, and to alter the same at pleasure; to make and establish by-laws, and to alter or repeal the same as they shall deem necessary, for the management or government, in all its various departments and relations, of the Illinois Industrial University, for the organization and endowment of which provision is made by this act. Said appointments to be subject to approval or rejection by the senate at its next regular session thereafter, and the appointees to be, and they are hereby authorized to act as trustees as aforesaid, until their successors shall be appointed by the governor and such appointment shall be approved by the senate." Ill. Rev. Stat. 1941, chap. 144, par. 22.

By section 7 of the act, the powers of the trustees were set out in the following language: "The trustees shall have power to provide the requisite buildings, apparatus, and conveniences; to fix the rates for tuition; to appoint such professors and instructors, and to establish and provide for the management of such model farms, model art, and other departments and professorships, as may be required to teach, in the most thorough manner, such branches of learning as are related to agriculture and the mechanic arts, and military tactics, without excluding other scientific and classical studies. They may accept the endowments of voluntary professorships or departments in the University, from any person or persons or corporations who may proffer the same, and, at any regular meeting of the board, may prescribe rules and regulations in relation to such endowments and declare on what general principles they may be admitted." Ill. Rev. Stat. 1941, chap. 144, par. 28.

By section 12, the college was located at Urbana in Champaign county, in consideration of certain inducements offered by that community, which are there set out at length. (Ill. Rev. Stat. 1941, chap. 144, par. 33.) Other sections of the act provided for military instruction, the sale, assignment and transfer of land scrip, the investment of the

funds received from such sales and other provisions, in compliance with the act of Congress above referred to.

By an act of June 19, 1885, the name of the corporation was changed to "University of Illinois." (Ill. Rev. Stat. 1941, chap. 144, par. 48.) By an act of June 15, 1887, it was provided that the trustees shall be elected from the State at large at regular general elections, instead of being appointed by the Governor, as provided in section 1 of the original act. Ill. Rev. Stat. 1941, chap. 144, par. 41.

Relators contend that the university is a legal entity separate and distinct from the State; that it is not an agency, a board, commission or department of the State government; that it is a creature of the legislature having a legal personality all its own; that it has the power to employ its own counsel as a necessary incident to its corporate life, implied in the power to sue and be sued, and to plead and be impleaded.

On the other hand, respondents contend that the university is an agency or instrumentality of the State; that its trustees are State officers; that its funds and property belong to the State; that the Attorney General is the sole legal representative of the State, its agents and instrumentalities, and that it can only be lawfully represented by the Attorney General, who is the chief law officer of the State and all its departments.

Able briefs and arguments have been presented on both sides, which are obviously the result of commendable energy and exhaustive research. They have been a great aid to the court. In the briefs on both sides and in the arguments at the bar, extensive theories have been classically expounded, analytical of the character and corporate powers of the Universities of Oxford and Cambridge. Comparisons of the charters of these universities with the charter powers of the University of Illinois, are made and relied upon by both sides. These great institutions trace their origin back to mediaeval times. The genesis of most of

their powers antedate their charters. They were acquired by prescription before their charters were granted. Both before and after their charters were issued they exercised sovereign powers, even as against the Crown.

The traditions of Oxford extend back to the dynasty of King John. It was not actually chartered as a corporate entity, however, until during the reign of Elizabeth in 1570. The University of Cambridge is also of ancient origin. It was the outgrowth of certain public schools established by the Monks in the vicinity of Cambridge in the 12th century. It was not chartered as a corporate entity until many years later. Each of these colleges passed its own laws, enacted its own statutes and elected its own executive and legislative departments. They also maintained their own courts. Their statutes were confirmed by Royal decree. Each was authorized to, and did, elect two members of the British Parliament. In certain fields within their territorial and ecclesiastical jurisdiction they administered both the civil and criminal laws. They possessed liberties *de Academia*. Lord Mansfield in *Rex* v. *Vice Chancellor*, 3 Burr. 1647, said: "But there is a vast deal of difference between a new charter granted to a new corporation, (who must take it as it is given,) and a new charter given to a corporation already in being, and acting either under a former charter or under prescriptive usage. The latter, a corporation already existing, are not obliged to accept the new charter *in toto*, and to receive either all or none of it: they may act partly under it, and partly under their old charter or prescription. Whatever might be the notion in former times, it is most certain now, 'That the corporations of the universities are lay-corporations: and that the Crown cannot take away from them any rights that have been formerly subsisting in them under old charters or prescriptive usage.' The validity of these new charters must turn upon the acceptance of the university. When Queen Elizabeth gave these statutes, the University of Cambridge

was of ancient establishment, and had many prescriptive rights, as well as former charters of very old date. And there was no intention to alter and overturn their ancient constitution. These statutes undoubtedly meant to leave a vast deal upon the ancient constitution of the university; without repealing or abrogating their old established customs, rights, and privileges; nor could the university mean to accept them upon any such terms. Therefore I am clear, that the Statutes of Queen Elizabeth cannot be set up, to invalidate establishments subsisting long before she was born." See also Holdsworth, A History of English Law, vol. I, p. 165, and Willard's, The Royal Authority and the Early English Universities, p. I.

In its corporate status and in its powers and privileges the University of Illinois is in no sense comparable to the Universities of Oxford and Cambridge. The issues here involved must be solved by an examination of the statute creating the University of Illinois, and the applicable decisions of this court. Authorities from other jurisdictions, many of which have been cited and carefully examined, are of little aid. The controlling principles are found in our own decisions. The principles announced in these decisions are firmly established. They can neither be obscured by precatory admonitions nor brushed aside by skeptical prophecies.

Under the decisions of this court, there is little room for speculation or disagreement as to the character of the University of Illinois as a corporate entity. In the case of *Spalding* v. *People,* 172 Ill. 40, where the question was directly involved, it was definitely held that while the university is not strictly a municipal corporation, it is nevertheless, a public corporation. It was organized for the sole purpose of conducting and operating the university, as a State institution. It is not a private corporation. In *Thomas* v. *Board of Trustees of Industrial University,* 71 Ill. 310, the question of its corporate status was directly

passed upon. It was there said: "There is nothing in the act from which it can be inferred that this institution was, in any respect, to be a private corporation, either in whole or in part. It was founded on donations from the general government, the county of Champaign, the Central railroad, and, it may be, from private individuals. These donations consisted of land scrip from the general government, lands and bonds given by Champaign county, freights by the railroad company, the title to which was transferred to the State, and became the property of the State, to hold in trust for the purposes of the university, and these trustees and officers were appointed by the authority of the State for its government and control. Private individuals have no interest in or control over it, but it is, in every sense of the term, a State institution. It, with its property, management and control, is entirely under the power of the General Assembly, and this has been recognized by the General Assembly by making subsequent appropriations for the erection of buildings, and to defray expenses, and by expressly prohibiting the board of trustees from obligating the State for the payment of any sum of money in excess of the appropriations thus made. (Sec. 3, acts 1871-2, p. 143.) The officers of the incorporation are paid, either directly or indirectly, from funds belonging to the State. All of the interest derived from the funds invested, from rents from real estate, and for tuition paid by pupils, or otherwise, belongs to the State, and hence there can be no pretense that the institution is private, or is to be governed by laws relating to private persons or corporations."

In *Board of Trustees of Industrial University* v. *Champaign County,* 76 Ill. 184, this court said: "It is true, that the General Assembly have created a body corporate, as the most convenient mode of controlling the institution, its property and affairs; but it will be observed that the State retains the power of appointing its trustees, and, no doubt, has power, through agents other than the trustees,

to sell and dispose of the property of the institution, or they may, at pleasure, amend or even repeal the charter, as public policy or the interest of the university may require." In *Elliott* v. *University of Illinois,* 365 Ill. 338, the same principle was announced.

In *People ex rel. Olmsted* v. *University of Illinois,* 328 Ill. 377, it was said: "Does this property belong to the State? The University of Illinois was founded by an act of the legislature approved February 28, 1867, as the Illinois Industrial University. In 1885 its name was changed to the University of Illinois. It is maintained by interest from its permanent endowment fund arising from grants of land from the United States and by appropriations made by the General Assembly. It is governed by a board of trustees elected by the people. Though the State has created a body corporate to control the University of Illinois, yet the State retains the power of selecting trustees, and may through other agents than the trustees sell and dispose of the property of the institution or change its charter as the legislature may direct. The property of the University of Illinois, though held by the board of trustees, belongs to the State. (*People* v. *Board of Trustees,* 283 Ill. 494; *Spalding* v. *People,* 172 id. 40; *Board of Trustees* v. *Champaign County,* 76 id. 184; *Thomas* v. *Industrial University,* 71 id. 310.) While the State through its board of trustees is virtually a trustee of the property and funds of the university for the use of the people, it nevertheless has power to resume the fund and to use it for the purposes designated. *City of Chicago* v. *People,* 80 Ill. 384."

It has no employees. Its employees are employees of the State. (*People ex rel. Redman* v. *Board of Trustees,* 283 Ill. 494.) Their selection and employment, however, are powers committed solely to the corporation. While it is true that the legislature has created a separate corporate entity, its powers are limited by the act of its creating. Such powers are limited to the purposes for which

it was created. By creating the corporation and conferring upon it the powers delegated by the act of its creation, the State has committed to it the operation, administration and management of the University of Illinois. While the legislature has the power at any time to modify or change, or even may take away entirely the powers thus conferred on the corporation, it can only do so by legislation. As long as the present statute is in force, the State has committed to the corporate entity the absolute power to do everything necessary in the management, operation and administration of the university.

The statute provides that the corporation shall have power to contract and be contracted with, to sue and be sued and to plead and be impleaded. Thus it is given contractual powers in all matters relative to the administration of the university. It may sue and be sued in connection with the exercise of such powers, the same as if it were a municipal corporation. (*Board of Trustees* v. *Bruner,* 175 Ill. 307.) It was also given power to acquire, hold and convey real and personal property. This power, however, is limited by statute. It can only acquire and hold property as the trustee and agent for the State. Because it holds all of its property merely for the State, obviously it cannot convey such property without being expressly authorized to do so by the State through its legislature. This is so, because the State is the beneficial owner of all property, the title to which may be held by the corporation. (*People ex rel. Olmsted* v. *University of Illinois, supra.*) In entering into contracts, if such contracts involve or in any way affect the property or property interest which it holds as trustee for the State, it must keep within the authorization and appropriations available. Within the limitations imposed, it has power to contract, to sue and be sued, and to plead and be impleaded concerning any matters arising out of the operation of the university. Such powers can be taken from it only by an amendment or re-

peal of the statute, by which such powers are conferred. The only power the State can exercise with reference to the administration and operation of the university is by limiting or withholding appropriations, or by changing the statute.

It is a public corporation, created for the specific purpose of the operation and administration of the university. As such, it may exercise all corporate powers necessary to perform the functions for which it was created. It is vested with exclusive power to conduct and manage the business affairs of the university. It may employ professors, teachers and other employees, over whose employment, services or activities, the State has no control. The State may, and does, biennially, in its appropriations for expenses to be incurred, designate the number, classification and rate of compensation of employees to be paid from funds belonging to the State. In its internal corporate affairs the State has no voice except indirectly by curtailing its appropriations or restricting the classification of employees and the purposes for which appropriations may be used. This the State has constantly done. In contracting with employees or others its powers are unlimited, except by the statute and by the classification and provisions found in the biennium appropriations. As to all matters incident to, or arising out of, the exercise of its corporate functions, it may contract and be contracted with, sue and be sued, plead and be impleaded, and it may exercise any other necessary or incidental powers in the furtherance of its corporate purposes. As to all such matters the State has no control over it, except indirectly, as above noted.

While it is a public corporation, it was organized and exists for one specific purpose. It is unique in that it has and can own no property in its own right. Whatever property or interest in property it acquires belongs to the State, and is held by it as trustee for the use of the State. It has no taxing powers and no means of raising money

or acquiring property, except through the operation of the university. Its power to borrow money and to issue bonds is granted and limited by the act of June 4, 1941. (Ill. Rev. Stat. 1941, chap. 144, par. 71 *et seq.*) True, it may receive donations and gifts, but whatever it may receive as such, like all other property which it acquires, it holds only as trustee for the State, the beneficial owner. It has no power to select its own trustees or managers. This power is reserved to the State. It functions solely as an agency of the State for the purpose of the operation and administration of the university, for the State. In doing this, it functions as a corporation, separate and distinct from the State and as a public corporate entity with all the powers enumerated in the applicable statutes, or necessarily incident thereto. It has and can exercise no sovereign powers. It is no part of the State or State government. As definitely held by this court in *Spalding* v. *People, supra,* by establishing the university the State created an agency of its own through which it proposed to accomplish certain educational objects, and the corporate entity created for that purpose is a public corporation belonging to the class of corporations enumerated in section 80 of division I of the Criminal Code. (Ill. Rev. Stat. 1941, chap. 38, par. 214.) Its contractual powers are so restricted by statute that it can create no liability or indebtedness against the State and no liability or indebtedness against itself as a corporate entity in excess of the funds in the hands of the treasurer of the university at the time of creating such liability or indebtedness and which may be specially and properly applied to the payment of the same. (Ill. Rev. Stat. 1941, chap. 144, par. 28.) No suit can be maintained against it which would adversely affect the rights of the State. *Schwing* v. *Miles,* 367 Ill. 436.

As such corporation it may formulate and carry out any educational program it may deem proper with complete authority over its faculty, employees and students, as well

as all questions of policy. Incident to its corporate existence and the exercise of its corporate powers, it has the undoubted right to employ its own counsel or engage the services of any other employees it may deem necessary or proper, by contract or otherwise. This power is, however, always subject to the restriction that when such faculty members or other employees are to be paid from State funds, they must be within the classifications for which funds have been appropriated and are available.

Under the power reserved to the State to select the trustees of the University of Illinois, the State, by statute, has repeatedly changed the manner of their selection. In their tenure they come within the definition of officers, found in section 24 of article V of the constitution. In the manner of their selection they come within the definition of State officers approved by this court. *Ramsay v. VanMeter,* 300 Ill. 193; *Fergus v. Russel,* 270 id. 304; *Wilcox v. People ex rel. Lipe,* 90 id. 186.

In *Fergus v. Russel, supra,* it was held that the definition of "offices" contained in section 24 of article V of the constitution is limited, in its application, to the State government with whose executive department article V of the constitution deals. (*Peabody v. Sanitary District,* 330 Ill. 250.) In *Spalding v. People, supra,* an officer of the University of Illinois was held to be an officer of a public corporation as distinguished from an officer of the State or a municipal corporation. These cases show that the question of whether any officer is a State officer is not to be determined alone from the territory from which he is selected or within which his official duties are to be performed. The question as to whether he is to be classified as a State officer also depends upon the character of the duties he is to perform, as such officer.

Here the trustees are elected from the State at large, but they perform no duties to the State, except through the corporation which they manage. They are responsible

to the corporation whose managing officers they are. The corporation, as a corporate entity, is the trustee responsible to the State. They are elected solely as trustees, directors or managing officers of the University of Illinois, which is a public corporation. They function only in that capacity. They are in many respects comparable to a common council created by statute as the governing body of a municipality. They perform no duties and exercise no powers, except the management of the corporation. While they are officers within the broad definition found in section 24 of article V of the constitution, they exercise no powers as State officers. They do not function as such.

The power of the legislature to create public corporations is practically unlimited. It may create any conceivable kind of a corporation it sees fit for the more efficient administration of public affairs and endow such corporation with such powers and functions as it deems necessary and proper for the administration of such corporate powers and affairs. (*People ex rel. Wies* v. *Bowman,* 247 Ill. 276.) In creating corporations, the legislature must necessarily provide the officers by and through whom their corporate powers are to be exercised and their corporate functions performed. In the matter of creating such offices and providing the manner in which they shall be filled, the legislative power is supreme. When the legislature creates an office, either public or corporate, such office is wholly within the power of the legislature creating it and it may prescribe and limit the powers and duties of the incumbent of such office. *Perkins* v. *Comrs. of Cook County,* 271 Ill. 449.

The power of the legislature is also unlimited as to who shall constitute the trustees, managing directors, or other officers or governing body of all public corporations, as well as the manner in which they shall be chosen. There is nothing in the constitution, or in the public policy or laws of this State, to prevent the legislature from providing for the selection of these officers, either by the people of

the whole State, or of any part of the State, in the same manner and at the same times, that State officers are elected. It can do this as to all public corporations, or as to cities, counties or other municipal or *quasi*-municipal corporations. The plan adopted may be changed at any time. This principle finds practical demonstration in the history of the statute under consideration. For the first twenty years of its existence the university was governed by trustees appointed by the Governor and approved by the Senate. In 1887 the statute was amended so as to provide for the election of three trustees in the general election in November, 1888, and at each general election every two years thereafter, for terms of six years. It further provided that the trustees so elected, together with the Governor, President of the State Board of Agriculture and the Superintendent of Public Instruction, should constitute the board. (Ill. Rev. Stat. 1941, chap. 144, par. 41.) Under the statute it seems clear that the sole function of the trustees of the University of Illinois is the management of the corporation. They are not State officers in the sense that the Attorney General is their legal advisor or representative, as contended by respondents in this case.

In *Fergus* v. *Russel, supra,* we held that while the constitution prescribed no express powers or duties of the Attorney General, he was a common-law officer and possessed all the powers and duties of the attorney general at common law, as the chief law officer of the Crown. Under our form of government, all the prerogatives which pertained to the Crown in England under the common law are vested in the people. In this State the Attorney General was vested, by the constitution, with all of the common-law powers of that officer. The common law is as much a part of the law of this State, where it has not been expressly abrogated by statute, as the statutes themselves. By creating the office of Attorney General, under its well-known common-law designation, the constitution conferred

upon it all the powers and duties of the attorney general under the common law and gave to the General Assembly the authority to confer and impose upon the incumbent of that office such additional powers and duties as it should see fit.

The same principles were announced in *Dahnke* v. *People,* 168 Ill. 102, *People ex rel. Gullett* v. *McCullough,* 254 id. 9, and *Chicago Mutual Life Indemnity Ass'n* v. *Hunt,* 127 id. 257. Neither the constitution nor the statutes, however, have conferred upon the Attorney General the power, or imposed upon him the duty, to represent public corporations, their managing trustees or other officers. No such powers or duties existed at the common law.

In the sense that it is a department or branch of the State government, the University of Illinois is not an agency or instrumentality of the State. It is a separate corporate entity, which functions as a public corporation. It is not the duty of the Attorney General to represent either the corporation or the trustees, by virtue of his office, as chief law officer of State. He has no right to do so. Both the university as a public corporation and its trustees are entitled to select their own legal counsel and advisor and to be represented in all suits brought by or against them by counsel of their own choice. As the managing or governing body of the university and all its property, clearly it would be the duty of the Attorney General to institute all appropriate procedings against the corporation, and its officers and trustees, to either prevent or redress any breach of the trust. He would do this as the representative of the State and not as the representative of the corporation or its trustees. Ill. Rev. Stat. 1941, chap. 14, par. 4; *People ex rel. Barrett* v. *Finnegan,* 378 Ill. 387; *Saxby* v. *Sonnemann,* 318 id. 600; *Hunt* v. *Chicago Horse and Dummy Railway Co.* 121 id. 638.

As determinative of the right of relators to have issued to them salary warrants by the Auditor of Public Accounts,

as claimed in the petition, we refer to the facts alleged on which this claim is based. With reference to relator Johnson, it is alleged in the petition that during the academic year 1941-42 the university, in accordance with its established procedure, certified payroll vouchers covering the position held by him under the following description, "Sveinbjorn Johnson, Professor and Counsel." It sets out the creation of the position of "University Counsel" and his appointment and succession to that office, naming his predecessor, in great detail. His duties as University Counsel are set out at length, as well as his professorial duties. In the payroll vouchers, no division was made as to the amount due him for professorial services and the amount due him as University Counsel. As to relator Hodges, the petition alleges that he performed services during the academic year 1941-42 as "Student Loan Assistant" and "Assistant University Counsel;" that as "Assistant University Counsel" he was entitled to a salary of $900 per year, payable from State appropriations to the University.

It is nowhere alleged in the petition that funds had been appropriated or were available for payment of "University Counsel" or "Assistant University Counsel." The duties of University Counsel and Assistant University Counsel, as distinguished from professorial and other duties, are, however, clearly set out in the petition. They are wholly unrelated. From the petition it is clear that although the duties may all be performed by the same individual, a professor is not necessarily either a counsel or an assistant counsel, any more than a counsel or an assistant counsel could be classified as a professor.

It is well settled that before the Auditor of Public Accounts may be directed by *mandamus* to issue and deliver warrants to anyone claiming payments from the State, it must be clearly shown that a proper appropriation has been made and that there are available funds in the appropriation, against which such warrants may be drawn. In *Peo-*

*ple ex rel. Redman* v. *Board of Trustees of University of Illinois, supra,* we said: "The Attorney General further argues that the petition in this case does not state or show that there was at the time of filing said petition any appropriation against which it was the duty of the Auditor to draw his warrant and out of which it was the duty of the Treasurer to pay the sum claimed by the petitioner. Under section 17 of article IV of the constitution of 1870 it is provided that no money shall be drawn from the treasury except in pursuance of an appropriation made by law and on the presentation of a warrant issued by the Auditor thereon, and no money shall be diverted from any appropriation for any purpose other than that for which it was appropriated. Before mandamusing the State Auditor or State Treasurer, as prayed for in this petition, there must be sufficient funds alleged in said petition to show that they are under legal obligations or duty to perform the required act. (High on Ex. Legal Remedies, (3d ed.) secs. 114, 117; *Stevens* v. *Truman,* 127 Cal. 155.) The petition is defective if it does not allege facts from which it can be fairly inferred that there is a specific fund from which such money can be drawn. (*Commissioners* v. *State,* 42 Kan. 327; *People* v. *Stevenson, supra* [270 Ill. 569.])" To the same effect is *Bengson* v. *City of Kewanee,* 380 Ill. 244; *DeWolf* v. *Bowley,* 355 id. 530; *People ex rel. Downs* v. *Brown,* 281 id. 390; *Board of Supervisors* v. *People ex rel. Comrs. of Highways,* 222 id. 9; *Fitzsimmons* v. *O'Neill,* 214 id. 494; *City of Chicago* v. *People ex rel. Gray,* 210 id. 84.

Article IV, sections 17, 18 and 19, of the constitution makes it unlawful for the Auditor to issue warrants where there is no appropriation available for the purposes for which the warrants are issued. (*Adams* v. *Nudelman,* 375 Ill. 217; *Fergus* v. *Brady,* 277 id. 272.) In *Fergus* v. *Brady, supra,* we said: "These provisions of the constitution and statute are clear and unambiguous in terms and their purpose and object can not be misunderstood. \* \* \*

By section 19 the General Assembly is prohibited from authorizing the payment of any claim, or part thereof, created against the State under any agreement or contract made without express authority of law, and all such unauthorized agreements or contracts are null and void, with the exception that the General Assembly may make appropriations for expenditures incurred in repelling invasion or suppressing insurrection. By the Criminal Code the making of a contract in excess of the amount of an appropriation subjects the offender to a fine not exceeding $10,000 and removal from his office, trust or employment. No right whatever can grow out of the commission of a crime, and by the plain language of the constitution every claim or contract is utterly void if not within the amount of appropriations already made, unless there is express authority of law for the creation of the debt or claim or the making of the contract. In section 19 claims under any agreement or contract made by express authority of law are excepted, and if there is some particular and specific thing which an officer, board or agency of the State is required to do, the performance of the duty is expressly authorized by law. That authority is express which confers power to do a particular, identical thing set forth and declared exactly, plainly and directly, with well-defined limits, and the only exception under which a contract exceeding the amount appropriated for the purpose may be valid is where it is so expressly authorized by law. An express authority is one given in direct terms, definitely and explicitly, and not left to inference or to implication, as distinguished from authority which is general, implied or not directly stated or given."

Not only is the petition lacking in any averment that there are funds available in any appropriation against which it is claimed the warrants should be drawn, but this court takes judicial notice of the appropriation acts passed by the General Assembly. They are public statutes. *People*

*ex rel. Redman* v. *Board of Trustees, supra; People ex rel. Nelson* v. *Taylor,* 281 Ill. 355; *People ex rel. Downs* v. *Brown, supra.*

An examination of the appropriations for the University of Illinois for the 1941-42 biennium discloses that no appropriation for either "University Counsel" or "Assistant University Counsel," was made. Section 9 of the act making appropriations (Laws of 1941, p. 242,) sets out in detail a classification of employees of the University of Illinois for whom payments are to be made from the appropriations. We find nothing in section 9 or in any other part of the act or in any of the prior appropriation acts, appropriating funds for the University of Illinois, which could come under the classification or designation of "University Counsel" or "Assistant University Counsel." There is nothing in the appropriations which would authorize the Auditor to issue warrants for salaries or compensation for such officers or employees, when certified as such on the university payroll. Nor do we find any appropriation for the employment of attorneys or counsel, or for legal expenses, in any form or amount.

It is argued by relators, and the petition sets forth, that preceding the appropriations for the 1941-42 biennium, and preceding each appropriation for many years prior thereto, the University of Illinois has submitted, in its internal budget to the General Assembly, the funds needed for the current biennium in the operation of the university; that it has included in such budget, as necessary anticipated expense during the period covered by the budget the positions of "University Counsel" and "Assistant University Counsel." Preceding the passage of the appropriations by the General Assembly, it is alleged that copies of this internal budget have been delivered to each of the individual members of the General Assembly. From this premise it is argued, and the petition alleges, that the ensuing biennium appropriations were based upon the internal budgets so

submitted, and that appropriations for these positions were necessarily included in the appropriations because they were included in the internal budgets. This is not the averment of a fact. At best it is a mere speculative and inadmissible conclusion. This averment is not admitted by the answer when treated as a demurrer. It is purely an argument and a factual conclusion. In our opinion, it is a conclusion not justified by the facts. If we assume the facts alleged, the conclusion does not follow. With the internal budgets before it, in which were included items for the payment for counsel and assistant counsel, the appropriations made show that the legislature has consistently omitted to include any such items in its appropriations. The logical conclusion is that the legislature did not approve of those particular expenditures and, for that reason, refused to make appropriations therefor.

It follows that there being no averment in the petition of funds available for the payment of warrants, which petitioners ask this court to compel the Auditor to issue, it must be assumed that no such funds are available in any applicable appropriation. It appears from the appropriations made that no such items were included. In this situation, obviously, it was not the duty of the Auditor to issue the warrants, even though the salaries of relators had been duly certified in the university payrolls. The Attorney General was correct in advising the Auditor to refuse to issue the warrants. By the eighth subparagraph of section 4 of the statute prescribing the duties of the Attorney General, it is made his duty "To enforce the proper application of funds appropriated to the public institutions of the state * * *." Ill. Rev. Stat. 1941, chap. 14, par. 4.

The Auditor was equally justified in refusing to issue the warrants. Any prevailing custom to the contrary, however long followed, cannot aid petitioners in this respect. In *Fergus* v. *Russel, supra,* this court said: "We are not

unmindful of the fact that for many years it has been the practice of the legislature of this State, and of each house thereof, to thus appoint, by joint or separate resolutions, committees to act after the session of the legislature had ended, but we have never been called upon to determine the validity of such action. The long indulgence in this custom cannot create a right in the legislature, or either house thereof, to do that which it has no power or authority to do."

In *Fergus* v. *Brady, supra,* with reference to the same subject, the following language was used: "The language of the constitution and intent of the people in adopting it being clear and free from doubt or uncertainty, the practice of the General Assembly and officers of the government in making appropriations has no influence in determining their legality. Contemporaneous construction is of value only where there is doubt and uncertainty, and there is none in this instance. All that has been done is that the General Assembly and public officials have disregarded constitutional requirements adopted by the people for their protection. It cannot be said that the people, who constitute the other party in interest, have acquiesced in the construction adopted by the General Assembly, since the money interest of an individual taxpayer would not justify the necessary expense of an appeal to the courts to prevent such unlawful action. It would not be practicable to enumerate the appropriations held void by the chancellor and to explain in detail their nature. Each one was for the payment of a claim created without express authority of law and either without a previous appropriation or in excess of the appropriation." See also *People ex rel. Lucey* v. *Turney,* 273 Ill. 546, and *Whittemore* v. *People,* 227 id. 453.

The Attorney General was in error in assuming that he was the sole legal representative of the University of Illinois, or its trustees. He was also in error in appearing in the case described in the petition, pending in the circuit

court of Cook county, as attorney for the university and the other defendants therein named.

The writ of *mandamus* is awarded directing the Attorney General to move to withdraw his appearance and all pleadings filed by him in the case of People of the State of Illinois *ex rel.* etc., v. University of Illinois *et al.*, general number 42C11035, being an action at law on the docket of the circuit court of Cook county. In all other respects the prayer of the petition is denied.  *Writ awarded.*