(No. 72413.—

THE PEOPLE OF THE STATE OF ILLINOIS *ex rel.*
NEIL F. HARTIGAN *et al.*, Appellees and Cross-Appellants, v. E & E HAULING, INC., *et al.*, Appellants and Cross-Appellees.

*Opinion filed December 4, 1992.*

474

476

HEIPLE, J., dissenting.

Thomas W. McNamara, Thomas K. McQueen, Norman M. Hirsch, Robert P. Zapinski and Lawrence S. Schaner, of Jenner & Block, William J. McKenna, Jr., David B. Goroff and Patrick F. Solon, of Hopkins & Sutter, Gary L. Griffin and Cornelius Francis Riordan, of McNeela & Griffin, Ltd., Thomas J. Fleischmann, of Gessler, Flynn, Fleischmann, Hughes & Socol, Ltd., and Daniel S. Mathless, all of Chicago, for appellants and cross-appellees.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Jeffrey W. Finke, of Hartmann & Finke, Special Assistant Attorney General, of Chicago, of counsel), for appellees and cross-appellants.

JUSTICE CLARK delivered the opinion of the court:

On January 31, 1989, Illinois Attorney General Neil Hartigan and the Illinois Department of Transportation (the Department) filed a 21-count amended complaint against 23 separate defendants. All of the defendants were construction contractors who had participated in construction of the McCormick Place Annex or in various State highway construction projects. Counts I through XV were brought by the Attorney General on behalf of the People and taxpayers of the State of Illinois. In these counts, the Attorney General alleged various acts of common law fraud, violations of the Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1987, ch. 121½, par. 261 *et seq.*) and unjust enrichment. These counts arose out of construction contracts between defendants and the Metropolitan Fair and Exposition Authority (the Authority) for construction of the McCormick Place Annex.

Counts XVI through XVIII were brought by the Attorney General and the Department. These counts alleged common law and statutory fraud as well as breach of contract relative to highway construction projects. Count XVIII, which alleged breach of contract, is not part of this appeal.

The defendants included the following entities who are parties to this appeal: E & E Hauling, Inc.; its successor, American Environmental Construction Company; Edward Heil, individually and as director of E & E and American Environmental; George Schiewe, individually

and as an agent of E & E; Leininger Mid-States Paving
Company; Peter Palumbo, individually and as director
and managing agent of Leininger; Richard Zawacki, indi-
vidually and as an agent of Leininger; Joseph Palumbo,
individually and as president and director of Leininger;
Dan Tessarolo, individually and as an agent of Leininger;
Coke Contracting, Inc.; Sam Alberto, individually and as
president of Coke; Tom Alberto, individually and as
former agent of Coke; T.C. Schreiner, individually and
as vice-president of Nu-Way Contracting Corporation;
Lo-Mar Contracting Corporation; Ruben Melesio, individ-
ually and as president of Lo-Mar, Highway Safety Cor-
poration and Hi-Gate Erectors, Inc.; James R. Nugent,
individually and as an agent of Lo-Mar and as former
vice-president of Robert R. Anderson Co.; Lois A. Nu-
gent, individually and as an officer of Lo-Mar; Betty Kit-
terman, individually and as an agent of Lo-Mar.

The trial court granted defendants' motions to dis-
miss under section 2—615 of the Code of Civil Procedure
(Ill. Rev. Stat. 1987, ch. 110, par. 2—615). In its order of
dismissal, the trial court stated that the Attorney Gen-
eral lacked standing to assert claims on behalf of the Au-
thority and failed to state a cause of action. In addition,
the trial court dismissed the RICO counts because State
courts did not have jurisdiction to consider claims under
the Federal Racketeering Influenced and Corrupt Orga-
nizations Act (18 U.S.C. §1961 *et seq.* (1988)). The appel-
late court reversed in part and affirmed in part. (218 Ill.
App. 3d 28.) We granted defendants' petition for leave to
appeal from that portion of the appellate court's judg-
ment which reversed the trial court's ruling. (134 Ill. 2d
R. 315.) The Attorney General seeks cross-relief on those
counts for which the appellate court affirmed the trial
court.

## STANDING

Before discussing the sufficiency of the complaint, we must first consider defendants' contention that the Attorney General has no standing to assert claims relating to the Authority's contracts. The standing doctrine assures that issues are presented to a court only by parties who have a sufficient stake in the outcome of the controversy. (*Harris Trust & Savings Bank v. Duggan* (1983), 95 Ill. 2d 516, 527, citing *Sierra Club v. Morton* (1972), 404 U.S. 727, 31 L. Ed. 2d 636, 92 S. Ct. 1361.) Absent the necessary allegations of interest in the controversy, a party lacks standing to sue.

The Authority is a public corporation established by the Metropolitan Fair and Exposition Authority Act (Ill. Rev. Stat. 1985, ch. 85, par. 1223) to promote, operate and maintain conventions and to construct, equip and maintain buildings for these conventions (Ill. Rev. Stat. 1985, ch. 85, par. 1224). Under its enabling statute, the Authority has the power to enter into contracts (Ill. Rev. Stat. 1987, ch. 85, par. 1225(d)) and may sue and be sued in its own name (Ill. Rev. Stat. 1987, ch. 85, par. 1223). Defendants argue that because the Authority has not filed suit itself, nor has it authorized the Attorney General to do so, the Attorney General lacks standing to bring claims arising out of the Authority's contracts.

The Attorney General brings this action "on behalf of the people and taxpayers of Illinois," and he asserts three bases for his standing to bring this suit. First, he argues that he has standing under the common law powers delegated to him by the Illinois Constitution. Second, he argues the legislature has provided standing under the statutory powers of his office. Third, he argues that a taxpayer would have standing to bring this suit and, therefore, he has standing as the representative of all the taxpayers of this State. Because we be-

lieve the Attorney General has standing under his common law powers, we need not address the latter two arguments.

Article V, section 15, of the Illinois Constitution of 1970 provides:

"The Attorney General shall be the legal officer of the State, and shall have the duties and powers that may be prescribed by law."

In *Fergus v. Russel* (1917), 270 Ill. 304, this court held that the Attorney General has all the common law powers incident to that office. In *Fergus*, this court stated:

"[T]he Attorney General is the chief law officer of the State, and the only officer empowered to represent the people in any suit or proceeding in which the State is the real party in interest, except where the constitution or a constitutional statute may provide otherwise." (*Fergus*, 270 Ill. at 342.)

In addition to representing the State and its agencies, the Attorney General is responsible for representing the broader interests of the State. (*Environmental Protection Agency v. Pollution Control Board* (1977), 69 Ill. 2d 394, 401.) Further, although the legislature may add to the Attorney General's common law powers, it may not detract from them. The holding of *Fergus* was incorporated into the Illinois Constitution of 1970. *People ex rel. Scott v. Briceland* (1976), 65 Ill. 2d 485; *Stein v. Howlett* (1971), 52 Ill. 2d 570.

In examining the scope of an attorney general's common law powers, one court noted they are "as broad as the 'protection and defense of the property and revenue of the state,' and, indeed, the public interest requires." (*State of Florida ex rel. Shevin v. Exxon Corp.* (5th Cir. 1976), 526 F.2d 266, 271.) The Attorney General has the common law duty to protect the public purse as a matter of general welfare. (*State of Illinois v. Bristol-Myers Co.*

(D.C. Cir. 1972), 470 F.2d 1276, 1278.) Thus, at common law, an attorney general had "complete authority as the representative of the State or any of its political subdivisions 'to recover damages [whether under state or federal law] alleged to have been sustained by any such agency or political subdivisions,' even though those subdivisions may not 'have affirmatively authorized suit.' " *Nash County Board of Education v. Biltmore Co.* (4th Cir. 1981), 640 F.2d 484, 494.

In *State of Illinois v. Brunswick Corp.* (1963), 32 F.R.D. 453, the court considered whether the Illinois Attorney General had standing to assert claims belonging to incorporated public school districts. The court stated:

> "[T]he Attorney General in this instance has authority not only to represent the State of Illinois as proprietor of State institutions which are not incorporated, but also those which are incorporated with powers to sue and be sued, especially where those corporations fail to exercise those corporate powers and the funds of the State have been utilized for their support ***." *Brunswick*, 32 F.R.D. at 456.

Defendants rely on this court's opinion in *People ex rel. Board of Trustees of the University of Illinois v. Barrett* (1943), 382 Ill. 321. *Barrett* was a *mandamus* action in which the Board of Trustees and two of its attorneys sued the Attorney General to prevent him from interfering with the attorneys' representation of the University. The Attorney General argued that as the State's chief law officer, he alone had the authority to represent the University in all legal matters. This court rejected the Attorney General's argument in *Barrett* and held that because the University of Illinois was a public corporation the Attorney General was not authorized to represent the University. This court stated:

> "Neither the constitution nor the statutes, however, have conferred upon the Attorney General the power, or im-

posed upon him the duty, to represent public corporations, their managing trustees or other officers. No such powers or duties existed at the common law." *Barrett*, 382 Ill. at 347.

Defendants argue that *Barrett* clearly precludes the Attorney General from bringing the instant action. However, *Barrett* did not consider the issue of standing. In *Barrett*, this court decided only whether the Attorney General could impose his representation on a public corporation which objected to that representation. In this case, the Authority has not objected to this suit.

It is significant that the Attorney General does not purport to represent the Authority, but rather the People and taxpayers of the State. The importance of this distinction is evidenced by the following passage in *Barrett*:

"As the managing or governing body of the university and all its property, clearly it would be the duty of the Attorney General to institute all proceedings against the corporation, and its officers and trustees, to either prevent or redress any breach of the trust. He would do this as the representative of the State and not as the representative of the corporation and its trustees." (*Barrett*, 382 Ill. at 347.)

Thus, *Barrett* is inapposite.

"It has long been the rule under the common law that the Attorney General may not appear in cases in which the public generally is not interested." (*People ex rel. Lowe v. Marquette Fire Insurance Co.* (1933), 351 Ill. 516, 527.) In this light, we note that the State of Illinois has an interest in the property of all of its political subdivisions. (See *County of Stark v. County of Henry* (1927), 326 Ill. 535, 537, 538 ("The whole State has an interest in the revenue of a county ***"; "Public highways, and bridges on them, do not belong to the counties and towns which construct them but are held by them in trust for

the entire public'').) Further, in his complaint in the instant action, the Attorney General alleged that the State has provided over $145 million of State funds to the Authority since 1955. We believe these facts give the State an interest in this case. For these reasons, we hold that the Attorney General has standing under his common law powers to assert these claims on behalf of the State.

## CONSUMER FRAUD ACT

Defendants next contend that the appellate court erred in finding that the Consumer Fraud Act (Ill. Rev. Stat. 1987, ch. 121½, par. 261 *et seq.*) applies to this case. Defendants allege the complaint fails to state a cause of action under the Act because it fails to allege any harm to consumers. In an argument closely related to standing, defendants contend that neither the Authority nor the Department could assert a claim on its own behalf under the Act and, therefore, the Attorney General should not be permitted to assert a claim on their behalf.

In support of this argument, defendants cite this court's opinion in *Board of Education v. A, C & S, Inc.* (1989), 131 Ill. 2d 428, wherein this court held the plaintiff school districts could not assert a claim under the Consumer Fraud Act. In *A, C & S*, the trial court dismissed the plaintiffs' Consumer Fraud Act claims due to a lack of standing. On review, this court examined the definition of "person" contained in the Act and held:

> "[T]he legislature is aware of how to include a body politic within the definition of 'person' or 'corporation,' and we believe that its failure to do so in the Consumer Fraud Act shows an intent not to include them within the definition of persons who may sue based on the Act." (*A, C & S*, 131 Ill. 2d at 469.)

The definition of "person" was important because that term is used in section 10a of the Consumer Fraud Act

(Ill. Rev. Stat. 1987, ch. 121½, par. 270a) which grants private parties standing to bring a claim. Thus, *A, C & S* stands for the proposition that because a body politic is not a "person" under the Act, section 10a does not provide standing to bring a claim under the Act. This court's holding in *A, C & S* makes clear that the Department and the Authority cannot bring claims under the Consumer Fraud Act.

However, with respect to the Attorney General's standing to bring this action, *A, C & S* is not controlling. "A person's status as a consumer relates to his or her standing to sue as an individual under the Consumer Fraud Act," but is irrelevant to the Attorney General's standing to bring a suit. (*People ex rel. Daley v. Datacom Systems Corp.* (1991), 146 Ill. 2d 1, 32.) The Attorney General's standing to assert a claim under the Act comes from section 7 (Ill. Rev. Stat. 1987, ch. 121½, par. 267), which provides in pertinent part:

> "§7. Whenever the Attorney General or a State's Attorney has reason to believe that any person is using, has used, or is about to use any method, act or practice declared by *** this Act to be unlawful, and that proceedings would be in the public interest, he or she may bring an action in the name of the People of the State against such person ***." (Ill. Rev. Stat. 1987, ch. 121½, par. 267.)

Under section 7, the Attorney General is not limited in regard to whose interests he may seek to protect under the Act. *Datacom*, 146 Ill. 2d at 30.

Nothing in section 7 indicates that the defrauded party must be a consumer or "person" in order for the Attorney General to have standing, nor will we read such a requirement into that section. In *Datacom*, the Attorney General asserted a claim on behalf of individuals owing fines to the City of Chicago for parking violations. Although the alleged parking violators were not

consumers, this court concluded that the Attorney General could bring a claim under the Act. Provided the requirements of section 7 are met, the Attorney General may assert a claim under the Act even though the allegedly defrauded party is not a consumer.

As this case concerns large public works contracts, the Attorney General could reasonably conclude that this action is in the public's interest. Under section 7, we must now consider whether the Attorney General has reason to believe there has been a violation of the Act. Section 2 of the Act provides the following:

> "§2. Unfair methods of competition and unfair or deceptive acts or practices, *including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation* or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act', approved August 5, 1965, *in the conduct of any trade or commerce are hereby declared unlawful* whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act." (Emphasis added.) (Ill. Rev. Stat. 1987, ch. 121½, par. 262.)

It is not disputed that the defendants' actions were committed "in the conduct of [a] trade or commerce." Moreover, the Attorney General alleges that defendants made material misrepresentations in their dealings with the Authority and the Department. Thus, all the requirements of section 7 have been met, and the Attorney General has standing to bring claims under the Act, even though the allegedly defrauded parties were governmental units.

## SUFFICIENCY OF COMPLAINT

Having established that the Attorney General has standing to sue, we now turn to the sufficiency of the complaint. The Attorney General appeals from that portion of the appellate court decision which affirmed the trial court's dismissal of counts I, II, and V through XIII for failure to state a cause of action. Defendants appeal from the appellate court's reversal of the trial court's order with respect to counts III, IV, and XIV through XVII. For simplicity's sake, we will review each count sequentially regardless of which party is challenging the appellate court's ruling.

Because this case comes to us on a motion to dismiss, we must determine whether the complaint, when viewed in the light most favorable to the plaintiffs, alleges facts sufficient to establish a cause of action on which relief may be granted. (*Ziemba v. Mierzwa* (1991), 142 Ill. 2d 42, 46.) All well-pleaded facts in the complaint will be taken as true. *Ziemba*, 142 Ill. 2d at 47.

### MBE Provisions of the Authority's Site

### Preparation Contracts

Counts I and II were brought by the Attorney General against defendants E & E Hauling, E & E's director Heil, E & E's agent Schiewe, Leininger Mid-States Paving, Leininger's agent Zawacki, Lo-Mar, Lo-Mar's president Melesio and Nu-Way's vice-president Schreiner. These counts alleged that in 1984, the Authority contracted with E & E for site preparation work at the McCormick Place Annex. As a condition of these contracts, E & E agreed to employ certain specified percentages of minority business enterprises (MBEs) and women business enterprises (WBEs).

Counts I and II allege that as the prime contractor, E & E was required to submit sworn statements to the Authority "allocating the contract price to E & E and its subcontractors." In addition the complaint alleges that defendant subcontractors were required to submit lien waivers which disclosed the "true, cumulative dollar amount" received by each subcontractor. Counts I and II allege that defendants submitted sworn statements and lien waivers indicating that Nu-Way, Leininger and Lo-Mar were paid $40,000, $250,000 and $300,000 respectively when in fact these subcontractors received $37,600, $318,261.46 and $348,652.71.

In count I, the Attorney General asserts a common law fraud claim. Count I alleges that defendants "withheld and concealed from the [Authority] the actual facts in their posession which would have disclosed or led to disclosure of E & E's noncompliance" with the MBE and WBE provisions of the contract. Count I also alleges that the misrepresentations in the sworn statements and lien waivers were made "for the purpose of deceiving and defrauding the [Authority in order] to induce the [Authority] in reliance thereon to pay E & E." The complaint alleges that as a result of these misrepresentations, *bona fide* MBEs and WBEs were deprived of work, other contractors were prevented from obtaining the contract with the Authority and E & E improperly received payments to which it was not entitled.

In order to state a cause of action for common law fraud, a complaint must allege "(1) a false statement of material fact, (2) knowledge or belief of the falsity by the party making it, (3) intention to induce the other party to act, (4) action by the other party in reliance on the truth of the statements, and (5) damage to the other party resulting from such reliance." (*A, C & S*, 131 Ill. 2d at 452.) Further, "a complaint 'must plead sufficient acts or facts relied upon to establish the fraud' (*Hart v.*

*Brown* (1949), 404 Ill. 498, 503), and fraud must be a necessary or probable inference from the facts alleged." *Glazewski v. Coronet Insurance Co.* (1985), 108 Ill. 2d 243, 249.

We agree with the appellate court that count I was properly dismissed because it "contain[s] no allegations supporting the conclusion that the representations contained in the waivers were fraudulent or that injury resulted from the Authority's reliance on them." (218 Ill. App. 3d at 40.) Count I does not allege that incorrect documents were submitted as an inducement for the Authority to enter into the contract. Although count I alleges that the documents were submitted to avoid detection of E & E's alleged noncompliance with the MBE and WBE provisions of the contract, that count contains no facts which show the MBE and WBE provisions were actually violated. For example, count I does not contain allegations regarding the MBE requirements under the contract, which subcontractors are MBEs and WBEs, or that the amounts actually paid to subcontractors were insufficient to meet these requirements. We note that elsewhere in the complaint Lo-Mar is identified as a purported MBE. If, as count I alleges, Lo-Mar received more than the amount indicated in the lien waiver, it is difficult to see how the lien waiver concealed E & E's noncompliance with the MBE provisions of the contract, or deprived MBEs of work to which they were entitled. Without specific allegations of facts which show a connection between submission of the inaccurate lien waivers and some injury to the Authority, count I was properly dismissed.

Similarly, we believe count II was also properly dismissed. In count II, the Attorney General alleges that defendants committed acts of unfair competition under the Consumer Fraud and Deceptive Trade Practices Act (Ill. Rev. Stat. 1985, ch. 121½, par. 261 *et seq.*) and Uni-

form Deceptive Trade Practices Act (Ill. Rev. Stat. 1985, ch. 121½, par. 312 *et seq.*). In order to state a claim under the Consumer Fraud Act, a complaint must set forth specific facts which show that defendants misrepresented a material fact in the conduct of a trade or commerce, with the intent that others would rely on such misrepresentation. (Ill. Rev. Stat. 1985, ch. 121½, par. 262.) The complaint must set forth specific facts which establish each element of the claim. In regard to count II, the representations in the lien waivers will only be material if some connection is shown between the lien waivers and the MBE and WBE requirements. Because count II suffers from the same deficiencies discussed with respect to count I, we find that the complaint is insufficient to establish such a connection.

Counts III and IV were brought against E & E, Heil, Schreiner, Leininger, Leininger's managing agent Peter Palumbo, its president Joseph Palumbo, its agent Tessarolo, Lo-Mar, Melesio and Lois Nugent. These counts allege that under its contract with the Authority, E & E agreed to employ a certain percentage of MBEs and WBEs who would perform a "commercially useful function." Pursuant to the contract, defendant Heil, acting on behalf of E & E, submitted a sworn statement indicating that Lo-Mar would perform $300,000 in work and that Nu-Way, a purported WBE, would perform $40,000 in work. The complaint alleges that at the time of this statement, Heil knew that Leininger, a nonminority firm, would perform Lo-Mar's work and that an unnamed, nonminority, nonwomen firm would perform Nu-Way's work.

Counts III and IV also allege that defendant Melesio, acting on behalf of Lo-Mar, represented that Lo-Mar would not subcontract any portion of its work. Despite these representations, the complaint alleges that Lo-Mar received $348,652.71 for its portion of the work, that it

subcontracted all of its work to Leininger and paid Leininger $335,078.83 for that work, and that Lo-Mar retained $13,573.88 for its role as "an illegal conduit for [E & E] paying Leininger."

Counts III and IV allege that E & E, Lo-Mar, Leininger and Nu-Way made these representations for the purpose of deceiving and defrauding the Authority, and to induce the Authority to rely on these representations in awarding the contract to E & E. Counts III and IV also allege that the Authority reasonably relied on these misrepresentations, and that had the Authority known the truth it would not have awarded the contract to E & E or paid E & E under the contract.

Defendants argue that the Authority suffered no damages as a result of their failure to comply with the MBE and WBE provisions. Defendants contend that the Authority received what it paid for, *i.e.,* the site preparation work, and that if it had not paid defendants for this work it would have paid someone else for it. Defendants contend that since the complaint does not allege that the Authority was overcharged for the work, that the work was not satisfactorily completed or that absent the misrepresentation it would have paid other contractors less, the Authority has suffered only an intangible loss. This argument ignores the fact that the complaint alleges that defendants breached the MBE and WBE provisions of the contract and then undertook to conceal that breach through misrepresentation.

Based on the contract and the allegations in the complaint, the parties considered the MBE-WBE provisions to be material. The contract stated that failure to comply with the MBE-WBE provisions would constitute a breach of the contract and result in "termination of the contract or such remedy as deemed appropriate." The complaint alleges that defendants employed a scheme of misrepresentation and deceit to conceal their noncompli-

ance with these provisions. Defendants cannot be placed in a better position than they would have been in without the misrepresentation. While it is clearly too late to terminate the contract, plaintiffs are not precluded from seeking another appropriate remedy. At this stage of the proceedings, we need not address the proper measure of damages. In order for plaintiffs to meet the pleading requirement for the element of damage, it is sufficient that we find plaintiffs are entitled to some remedy for the alleged breach and subsequent misrepresentation.

Counts V, VI and VII were brought against E & E and Heil and relate to a letter Heil sent to the Authority. The complaint alleges that in a meeting with E & E representatives, the Authority demanded "a statement from E & E Hauling so that [the Authority] could verify that E & E had complied with [the Authority's] minority and women business enterprise program." Specifically, the Authority stated that it would not pay E & E an installment of $133,353.62 unless E & E provided a statement indicating "the amounts received by Leininger, Lo-Mar, and Nu-Way and whether those amounts were in connection with work on the base contract or change orders on the site preparation job." In response to this demand, Heil sent a letter which contained the following chart:

| | Base Contract | Change Order | Total |
|---|---|---|---|
| | $1,298,000.00 | $977,908.86 | $2,275,908.86 |
| [LABOR] | | | |
| E & E | 762,543.00 | 178,480.00 | 41,023.00 |
| Nu-Way (WBE) | 12,800.00 | NONE | 12,800.00 |
| Lo-Mar (MBE) | NONE | NONE | NONE |
| [MATERIALS] | | | |
| E & E | 195,457.00 | 549,428.86 | 744,885.86 |
| Leininger | NONE | 250,000.00 | 250,000.00 |
| Nu-Way (WBE) | 27,200.00 | NONE | 27,200.00 |
| Lo-Mar (MBE) | 300,000.00 | NONE | 300,000.00 |

The complaint alleges the letter contained four mate-

rial misrepresentations, namely that (1) Lo-Mar received $300,000 for its work when in fact it did no work and received only $13,573.88 after paying Leininger; (2) Leininger did no work on the base contract when in fact it performed all of Lo-Mar's work; (3) Leininger received a total of $250,000 when in fact it received $653,340.29; and (4) Nu-Way received $40,000 when in fact it did no work and "served as an illegal conduit for paying a non-women, nonminority firm." Finally, the complaint alleges that these misrepresentations were made for the purpose of inducing the Authority's reliance on the misrepresentations and that the Authority reasonably relied on these representations when it paid E & E $133,353.62.

The appellate court considered each of the four alleged misstatements and found that the letter did not support plaintiffs' allegations. (218 Ill. App. 3d at 42-43.) The appellate court correctly noted that a motion to dismiss does not admit facts alleged in a complaint when those allegations are contradicted by facts contained in an exhibit. (218 Ill. App. 3d at 43.) Based on its finding that the allegations in the complaint were inconsistent with the letter, the appellate court upheld the dismissal of counts V and VI, which alleged common law misrepresentation and violation of the Consumer Fraud Act respectively.

While we do not disagree with the legal basis for the appellate court's decision, we disagree with the finding that the letter contradicts the complaint. The appellate court found that the letter showed Lo-Mar received nothing for its "labor" and, therefore, the letter contradicts plaintiffs' claim that Lo-Mar received $300,000 for its "work." The appellate court's conclusion in this regard is based on an unreasonably restrictive interpretation of "work" as that phrase is used in the complaint. The appellate court improperly reads the complaint and letter as if "work" entails nothing more than "labor." It

is reasonable to conclude that, as used in the complaint, "work" includes both "labor" and "materials." When read this way, the allegations in the complaint are supported by the letter.

Similarly, the appellate court took a narrow interpretation of the letter when it found the letter was silent as to the amount of work done by Leininger on the base contract. Again, the appellate court's interpretation was based on the assumption that "work" and "labor" were completely synonymous. Moreover, we note that the numbers supplied by Heil in the letter necessarily imply that Leininger received no payments under the base contract. If, as the complaint alleges, Leininger did all of Lo-Mar's work and received payment for that work, then the letter is misleading. In addition, the complaint alleges Leininger received total payments of $653,340.29 while the letter states the company received only $250,000. Again, we believe the allegations in the complaint are not contradicted by the letter.

With respect to Nu-Way, the appellate court found that the complaint alleges "only that Nu-Way did no work on the project, not that the letter misstates the amount Nu-Way was paid." (218 Ill. App. 3d at 43.) This statement ignores the fact that the complaint also alleges Nu-Way "served as an illegal conduit for paying a nonwomen, nonminority firm."

While complaints for fraud must plead specific facts, the semantical precision on which the appellate court based its opinion is not required. Because we are reviewing an order on a section 2—615 motion, all reasonable inferences from well-pleaded facts must be drawn in plaintiffs' favor. With this in mind, we find that counts V and VI state causes of action under the common law and Consumer Fraud Act respectively.

On the other hand, count VII, which asserts a claim for unjust enrichment based on the letter, does not set

forth a proper cause of action. The theory of unjust enrichment is based on a contract implied in law. To recover under this theory, plaintiffs must show that defendant voluntarily accepted a benefit which would be inequitable for him to retain without payment. (*Premier Electrical Construction Co. v. La Salle National Bank* (1985), 132 Ill. App. 3d 485, 496.) Because unjust enrichment is based on an implied contract, "where there is a specific contract which governs the relationship of the parties, the doctrine of unjust enrichment has no application." (*La Throp v. Bell Federal Savings & Loan Association* (1977), 68 Ill. 2d 375, 391, quoting *Brooks v. Valley National Bank* (1976), 113 Ariz. 169, 174, 548 P.2d 1166, 1171.) In count VII the Attorney General asserts that E & E had an express contract with the Authority. Therefore, count VII was properly dismissed.

## Illegal Dumping by E & E

The Attorney General next challenges the appellate court's decision to affirm the dismissal of counts VIII and IX. These counts were brought against E & E and Heil, and relate to the disposal of materials from excavation activities at the McCormick Place Annex. Counts VIII and IX allege that as part of its contract with the Authority, E & E was required to dispose of all materials legally. Despite this requirement, the complaint alleges that E & E dumped some materials into the Mallard Lake landfill without preparing the required documentation or paying the appropriate charges to the Du Page County Forest Preserve District. Further, the complaint alleges E & E illegally dumped unsuitable materials in a landfill which Terra Excavating, Inc., leases from Illinois International Port District.

Count VIII asserts a claim for unjust enrichment based on the allegedly illegal dumping. The appellate court affirmed the dismissal of this count based on the

existence of an express contract between E & E and the Authority. (218 Ill. App. 3d at 44.) Although count VIII repeatedly refers to the Authority's contract, on appeal, the Attorney General argues that count VIII seeks restitution on behalf of the Du Page County Forest Preserve District and the Terra Excavating, Inc., landfill. Therefore, he argues count VIII states a cause of action for unjust enrichment regardless of the Authority contract.

The Attorney General is correct that a contract between E & E and the Authority does not necessarily preclude an unjust enrichment claim on behalf of the two landfills. We note, however, that the complaint alleges no facts which give the Attorney General standing to assert this claim. The complaint contains no allegations of fact regarding who owns the Mallard Lake landfill. Similarly, although the complaint alleges that the Terra Excavating landfill is leased from the Illinois International Port District, it does not allege that the Port District is a State agency or that the District is responsible for cleaning the site. Without such allegations, the Attorney General has no standing to assert an unjust enrichment claim on behalf of the landfills.

Count IX asserts a claim under the Consumer Fraud Act for the alleged illegal dumping. In addition to the facts alleged in count VIII, count IX alleges that E & E "concealed, suppressed, or omitted the material facts that it was illegally disposing of excavation materials" and that E & E intended that the Authority would believe that E & E was legally disposing of the material. Count IX does not allege any misrepresentation, it merely alleges that E & E did not comply with a contract provision and did not voluntarily disclose this noncompliance. While the complaint alleges that E & E polluted the Terra Excavating landfill and wrongfully deprived the forest preserve district of funds, the complaint does not allege that E & E performed any act in-

tended to induce reliance on the part of the forest preserve district or the Terra Excavating landfill. Moreover, the complaint does not allege that the Authority demanded any assurances from E & E regarding this provision of the contract.

Count IX also alleged that E & E was able to underbid its competitors because it did not legally dispose of excavated material. The Attorney General argues that this constitutes unfair competition under the Consumer Fraud Act and, therefore, count IX states a cause of action. Because count IX alleges no facts which support a conclusion that E & E was able to underbid competitors, we reject this argument. We agree with the appellate court that count IX does not allege facts with sufficient specificity to state a cause of action under the Consumer Fraud Act.

### Delivery of Materials

Counts X and XI were brought against Leininger, its president Joseph Palumbo, Coke Contracting, its president Sam Alberto and its agent Tom Alberto. Counts X and XI allege that Coke submitted four invoices to Leininger requesting payment for hauling tunnel stone to McCormick Place. After Leininger received these invoices, Palumbo called Coke and stated Leininger would not pay unless the invoices were altered to show that another type of stone was delivered to the Department's Eisenhower project. Coke then submitted four new invoices reflecting the requested changes and Leininger paid Coke the amount on the invoices. The complaint alleges that as a result of the altered invoices government agencies "apparently have paid for materials they never received."

Count X asserts a claim for common law misrepresentation. The appellate court correctly dismissed this count because it contains no allegations that the alleged mis-

representations were material or false. In addition, we note that the complaint does not allege that defendants intended these misrepresentations to induce any party to rely on them or that anyone did in fact rely on them. This count is wholly lacking in the specific allegations of fact necessary to support a claim of fraud.

Similarly, count XI fails to state a cause of action for violation of the Consumer Fraud Act. Count XI fails to allege that defendants intended to induce reliance and, therefore, this count was properly dismissed.

Counts XII and XIII allege that the Attorney General subpoenaed documents from Leininger concerning the delivery of stones to McCormick Place. In response to this subpoena, Leininger submitted check vouchers which contained Leininger's job numbers. Later, Leininger also submitted a list of job numbers and the corresponding job description. Counts XII and XIII allege that the job numbers contained on the checks for McCormick Place do not correspond to the list of jobs.

Count XII asserts a claim for common law fraud and count XIII asserts a claim under the Consumer Fraud Act. As the appellate court noted, neither of these counts alleges that defendants intended to induce reliance or that any party in fact relied on the alleged misrepresentation. Therefore, both counts were properly dismissed.

### MBE Provisions of Concrete Contracts

Counts XIV and XV were brought against the contractors responsible for supplying concrete to the Authority. The defendants included Paschen Contractors International; Paschen Contractors Associates, Inc.; Paschen Contractors, Inc.; Gust K. Newberg Construction Company; Paschen-Newberg Joint Venture; Hi-Gate Erectors, Inc.; Gateway Construction Company, Inc.; George N. Weiland, Jr., individually and as an officer of

Hi-Gate Erectors and Gateway; Highway Safety Corporation; and Reuben Melesio, individually and as president of Highway Safety Corporation and Hi-Gate Erectors, Inc. The Paschen and Newberg defendants reached a settlement agreement and are not part of this appeal.

Counts XIV and XV allege that Paschen-Newberg received the primary concrete contract. Under this contract Paschen-Newberg was required to employ a certain percentage of MBEs. In order to meet this requirement, Paschen-Newberg hired Hi-Gate and represented that this firm was a *bona fide* MBE. Hi-Gate is a corporation whose stock is owned by two other corporations: Gateway, a nonminority firm, owned 49% of the stock and Highway Safety, a minority firm, owned 51% of the stock. Melesio owned all of Highway Safety's stock and was president of the corporation. Weiland was a vice-president and director of Hi-Gate, owned all of Gateway's stock and was that corporation's president. Because the allegations against Weiland and Gateway are somewhat different than those against Melesio and Hi-Gate, we will address the defendants separately.

The complaint alleges that Hi-Gate and Melesio submitted an affidavit of MBE status to the Authority. This affidavit was incorrect in that it failed to include $100,000 of investments and advances made by Gateway in and to Hi-Gate; omitted tens of thousands of dollars of equipment rental by Hi-Gate from Gateway; and omitted several instances in which Hi-Gate, Melesio and Highway Safety were denied MBE certification by government agencies. The complaint alleges that the misrepresentations were material, that defendants intended these misrepresentations to induce reliance by the Authority and that the Authority in fact did rely on these misrepresentations to its detriment.

Count XIV asserts a common law fraud claim and count XV asserts a claim under the Consumer Fraud

Act. We have already set forth the pleading requirements for common law and statutory fraud claims. The allegations in counts XIV and XV meet these requirements and state a cause of action for common law and statutory fraud against Melesio and Hi-Gate. Therefore, the appellate court correctly reinstated these counts.

We now address Weiland's and Gateway's contention that the complaint is not sufficient to state a cause of action against them. These defendants argue that they cannot be held accountable for the actions of Melesio and Hi-Gate because there is no allegation that they participated in or had specific knowledge of the misrepresentations. The general rule with respect to a corporate officer's liability for the fraudulent acts of a corporation was set forth in *Murphy v. Walters* (1980), 87 Ill. App. 3d 415. In that case, the appellate court stated:

" 'The mere fact that a person is an officer or director does not per se render him liable for the fraud of the corporation or of other officers or directors. He is liable only if he with knowledge, or recklessly without it, participates or assists in the fraud.' " *Murphy*, 87 Ill. App. 3d at 418-19, quoting *Citizens Savings & Loan Association v. Fischer* (1966), 67 Ill. App. 2d 315, 322-23.

The complaint alleges that Gateway assisted in the preparation of Hi-Gate's affidavit, and that Gateway knew or was reckless in not knowing that the information was incorrect. In addition, the complaint alleges that Weiland was a vice-president and director of Hi-Gate and that he "instituted the policies complained of in this case and has been and continues to be responsible for establishing, supervising, directing, and controlling the business activities and practices of Hi-Gate Erectors, Inc. and Gateway Construction Co., Inc." Taking these allegations as true, the complaint is sufficient to hold Weiland and Gateway liable for the misrepresentation in Hi-Gate's MBE affidavit.

MBE Provisions of the Department's Contracts

Counts XVI, XVII and XVIII were brought by the Attorney General and the Department against Leininger, Lo-Mar, Melesio, Robert R. Anderson Company, Lo-Mar's vice-president and director Lois Nugent, Lo-Mar's agent Betty Kitterman and James R. Nugent, who was both an agent of Lo-Mar and former vice-president of Robert R. Anderson Company. Count XVI asserted a common law fraud claim while count XVII asserted a claim under the Consumer Fraud Act. Count XVIII is not a part of this appeal.

Counts XVI and XVII allege that the Department entered into two separate contracts with Anderson and one contract with Anderson and Leininger. All three contracts related to repair work on highways operated and maintained by the Department. As part of these contracts, Anderson and Leininger agreed to employ MBEs. Anderson and Leininger entered into subcontracts with Lo-Mar for work on all three primary contracts and represented to the Department that Lo-Mar was a *bona fide* MBE.

Melesio owned 55% of the Lo-Mar stock and Lois Nugent owned the remaining 45%. The complaint alleges that Lois' husband James Nugent, a vice-president of Anderson, managed the operations of Lo-Mar. In addition, the complaint alleges that Lo-Mar owned little or no equipment, that Lo-Mar's labor force consisted mostly of Anderson's employees, and that Lo-Mar repaid Anderson a large share of the amounts Lo-Mar received for its work on the Department contracts. Based on these facts the complaint alleges that Lo-Mar was not a *bona fide* MBE. The complaint further alleges that defendants' representations were made to induce the Department's reliance.

Defendants argue that the complaint fails to state a cause of action for common law fraud because it does not allege any injury. For the reasons stated above, we reject this argument. Moreover, the complaint alleges that the contract contained a provision requiring a dollar-for-dollar reduction in the amount paid to the prime contractor for any amounts by which participation of *bona fide* MBEs fell short of the contract requirements. This contract provision clearly sets forth the damages suffered by the Department in this case. Therefore, we find counts XV and XVI state a cause of action for common law and statutory fraud respectively.

## CONSTITUTIONALITY OF MBE PROVISIONS

Defendants Weiland and Gateway contend on appeal that the Authority's minority set-aside program is unconstitutional under the Supreme Court's decision in *City of Richmond v. J.A. Croson Co.* (1989), 489 U.S. 469, 102 L. Ed. 2d 854, 109 S. Ct. 706. In *City of Richmond* the Supreme Court held that States and municipalities may only enforce minority set-aside programs if there have been specific findings of past discrimination. *City of Richmond* did not establish a *per se* rule of invalidity. Rather, that case requires each minority set-aside program to be evaluated based on the evidence of past discrimination peculiar to the governmental entity enacting the program.

Weiland and Gateway argue that there has been no finding of past discrimination by the Authority and, therefore, the MBE provisions are unconstitutional. The appellate court refused to consider the merits of this argument because resolution of the issue would require consideration of facts not contained on the face of the complaint. (218 Ill. App. 3d at 49.) We agree with the appellate court that consideration of this issue is beyond the scope of defendants' section 2—615 motion.

## PLAINTIFFS' MOTION TO AMEND

After the first-amended complaint was dismissed by the trial court, plaintiffs requested leave to file a second-amended complaint, which request the trial court denied. Plaintiffs did not tender a copy of the proposed amended complaint at that time. Instead, on August 24, 1989, plaintiffs filed a "Statement of Proposed Additions to Proposed Second Amended Complaint."

The decision of whether to grant leave to file an amended complaint is within the sound discretion of the trial court. In considering whether a trial court abused its discretion, this court will consider (1) whether the proposed amendment would cure the defects in the original pleading; (2) whether the amendment would prejudice or surprise other parties; (3) whether the proposed amendment is timely; and (4) whether previous opportunities to amend the pleading can be identified. *Loyola Academy v. S & S Roof Maintenance, Inc.* (1992), 146 Ill. 2d 263, 273.

In its comments incorporated in the order denying leave to file a second-amended complaint, the trial court indicated that it did not believe the Attorney General could state a proper cause of action. The trial court based this conclusion on its view that the Attorney General lacked standing to bring the Authority's counts and that there were no damages as a result of the alleged misrepresentations. As we have answered these questions contrary to the trial court, it appears the decision not to grant leave to file a second-amended complaint was based on a misapprehension of the law. "[W]here the exercise of discretion has been frustrated by the application of an erroneous rule of law, review is required to permit the exercise in a manner ' "consistent with the law." ' " (*People v. Brockman* (1991), 143 Ill. 2d 351, 363, quoting *People ex rel. Chesapeake & Ohio Ry. Co. v.*

*Donovan* (1964), 30 Ill. 2d 178, 181.) On remand, it will be necessary for the trial court to reconsider plaintiffs' motion in light of our holdings today.

## PLAINTIFFS' MOTION FOR ADMINISTRATOR

While this case was pending review in the appellate court, defendant George Schiewe died. The Attorney General filed a motion in the appellate court for appointment of a special administrator for Schiewe's estate under section 2—1008(b) of the Illinois Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—1008(b)) and Supreme Court Rule 366(a) (134 Ill. 2d R. 366(a)). In a separate order, not contained in its decision on the case, the appellate court denied this motion. The Attorney General now appeals from this order. Because Schiewe was a defendant in counts I and II only, and because we affirm the dismissal of these counts, we affirm the appellate court's order.

## CONCLUSION

For the foregoing reasons, we agree with the appellate court's decision with respect to the issues of standing and constitutionality of the Authority's minority set-aside program. In addition, we affirm the appellate court's decision to affirm the circuit court's dismissal of counts I, II, and VII through XIII of the complaint and to reverse the circuit court as to its dismissal of counts III and XIV through XVII. We reverse the appellate court's decision to affirm the circuit court's dismissal of counts V and VI. We reverse the appellate court's decision to affirm the circuit court as to its refusal to allow the plaintiffs' motion to amend the complaint and we remand for reconsideration of that motion. Finally, we affirm the appellate court's ruling on the Attorney General's motion to appoint an administrator for the estate of defendant Schiewe.

The judgment of the appellate court is affirmed in part and reversed in part, the judgment of the circuit court is affirmed in part and reversed in part, and the cause is remanded to the circuit court for proceedings consistent with this opinion.

*Appellate court affirmed in part*
*and reversed in part;*
*circuit court affirmed in part*
*and reversed in part;*
*cause remanded.*

JUSTICE HEIPLE, dissenting:

I disagree with the majority's decision to remand several counts to the trial court. I would affirm the trial court's dismissal of the entire complaint.

First, the Attorney General does not have standing to bring this lawsuit. It is not within his common law or statutory powers to bring suit on behalf of a municipal corporation that could do so on its own. (*People ex rel. Board of Trustees of the University of Illinois v. Barrett* (1943), 382 Ill. 321, 332-45.) The majority distinguishes *Barrett* on the ground that here the public corporation that the Attorney General seeks to represent did not object. This reading of *Barrett* is too narrow. The appropriate rule of law is that a public corporation that has the power to hire its own attorneys and bring its own suits must affirmatively ask the Attorney General to intervene. This did not occur here.

Next, the Consumer Fraud Act (the Act) does not apply to the Metropolitan Fair and Exposition Authority (the Authority). This court's opinion in *Board of Education v. A, C & S, Inc.* (1989), 131 Ill. 2d 428, 467-69, is controlling on this point. The Authority, like the school districts in *A, C & S*, is a body politic and not a person who may bring suit under the Act.

Additionally, there is no basis for a lawsuit since there are no money damages. The majority incorrectly concludes that the Attorney General has stated an injury for which we may grant relief.

Finally, the majority errs by not addressing the constitutionality argument. This issue is not beyond the scope of a section 2—615 motion. Further, the facts of this case are indistinguishable from the facts in *City of Richmond v. J.A. Croson Co.* (1989), 489 U.S. 469, 102 L. Ed. 2d 854, 109 S. Ct. 706, and therefore the Minority and Women Business Enterprise set-asides violate the equal protection clause of the United States Constitution and article I, section 18, of the Illinois Constitution.

Accordingly, I respectfully dissent.