Donna Lee H. WILLIAMS, Insurance Commissioner of the State of Delaware, as Receiver of National Heritage Life Insurance Company in Rehabilitation, Continental Stock Transfer & Trust Company, Midwest Independent Bank, and Midwest Mortgage Servicing, L.L.C., Plaintiffs,

v.

NATIONAL HOUSING EXCHANGE, INC., APX Mortgage Services, Inc., and Resources Asset Management, Inc., Defendant.

No. 95 C 4243.

United States District Court,
N.D. Illinois,
Eastern Division.

March 29, 1999.

---

Michael S. Oberman, Ronald S. Greeberg, Kramer, Levin, Naftalis, Nessen, Kamin & Frankel, New York City, David J. Stetler, Stetler & Duffy, Ltd., Chicago, IL, for Donna Lee H. Williams.

Steven Samuel Scholes, Andrew Dash, Berlack, Israels & Liberman, New York City, Arnold A. Pagniucci, James A. Rolfes, Sachnoff & Weaver, Ltd., Chicago, IL, for Continental Stock Transfer & Trust Company.

Richard M. Waris, Pretzel & Stouffer, Chtd., Chicago, IL, for Midwest Independent Bank.

Richard M. Waris, Richard M. Waris, Pretzel & Stouffer, Chtd., Chicago, IL, Robert E. Davy, Robert E. Davy, Jr. & Associates, Chicago, IL, for Midwest Mortgage Servicing, L.L.C.

Marc Oliver Beem, David J. Krupp, Diane Frances Klotnia, Miller, Shakman, Hamilton, Kurtzon & Shlifke, Chicago, IL, for David J. Krupp.

Robert E. Davy, Robert E. Davy, Jr. & Associates, Chicago, IL, for Resource Asset Management, Keith Pound.

Scott R. Lassar, United States Attorney's Office, Chicago, IL, for United States of America.

### MEMORANDUM OPINION AND ORDER

BUCKLO, District Judge.

The plaintiffs brought this action against the defendants alleging various violations of federal and state law relating to a series of mortgage debentures and the servicing of the mortgages. Resource Asset Management, Inc. ["RAM"], brought counterclaims against Donna H. Lee Williams, the Insurance Commissioner of the State of Delaware, [the "Commissioner"], and Midwest Mortgage Servicing, L.L.C. ["Midwest"], for payment of certain fees. The Commissioner now moves for summary judgment on Count I of the counterclaim, and Midwest moves for summary judgment on Count II of the counterclaim. For the following reasons, the Commis-

sioner's motion is granted, and Midwest's motion is denied.

## Background

National Housing Exchange ("NHE") is the issuer of 21 series of 1993 8.5% Registered Collateralized Mortgage Debentures (the "Bond"), which has a total face value of $126,000,000 and is secured by a series of mortgage debentures. On December 28, 1993, National Heritage Life Insurance Company ["National Heritage"] purchased the Bond; on the same date, NHE entered into an Indenture and Servicing Agreement [the "Indenture"] with Continental Stock Transfer and Trust Company ["Continental"], the trustee of the Bond, and APX Mortgage Services ["APX"], the servicer of the mortgages securing the Bond. The Delaware Court of Chancery subsequently placed National Heritage in rehabilitation and then in liquidation. The Commissioner was appointed receiver for National Heritage.

In July 1994, Steven G. Nelson, chairman of Continental, wrote to NHE and APX advising that they had failed to comply with their obligations under the Indenture; in August 1994, a representative of the Commissioner sent NHE and APX similar letters of default. Then, on November 7, 1994, Continental notified NHE and APX that all of their rights under the Indenture were terminated. In November, Midwest assumed control of APX's assets pursuant to a security agreement that Midwest and APX had entered into earlier in the year.

Meanwhile, on October 6, 1994, Keith Pound incorporated RAM. On December 1, 1994, RAM took over APX's business, including the servicing of the mortgages.[1] Despite the termination letter it had received from Continental, on December 19 NHE authorized the appointment of Midwest as servicer of the mortgages on the condition that Midwest appoint RAM as subservicer. On December 23, 1994,

Midwest entered into a Subservicing Agreement [the "Agreement"] with RAM, pursuant to which RAM was appointed subservicer effective December 9, 1994. RAM told Continental on January 5, 1995 that NHE had appointed Midwest as servicer, and that Midwest had appointed RAM as subservicer. Continental rejected the designation of Midwest as servicer on January 10, and demanded that RAM relinquish all files relating to the mortgages. On January 18, Midwest, at the direction of the Commissioner and Continental, posted a 24-hour security guard on RAM's premises. At this time officers of Midwest became signatories on RAM's bank accounts relating to the Bond.

On February 23, 1995, Continental sent Midwest a letter agreeing to allow Midwest to act as servicer of the mortgages as of January 13, 1995, but expressly refusing to recognize NHE's prior appointment of Midwest. Midwest and RAM dispute the meaning and effect of this letter. Continental and the Commissioner filed a lawsuit against RAM on March 8, 1995, and litigation has continued ever since. The issues currently before the court involve RAM's counterclaims against the Commissioner and Midwest. Count I alleges that the Commissioner and Midwest are liable for the payment of accrued servicing fees under a theory of unjust enrichment. Count II alleges that Midwest is liable for the payment of a "pull fee" consisting of 1% of the unpaid principal balance of the Bond, pursuant to the December 1994 Agreement between RAM and Midwest. The Commissioner moves for summary judgment on Count I, and Midwest moves for summary judgment on Count II.

## Summary Judgment on Count I

RAM argues that under the theory of unjust enrichment, it is entitled to recover from the Commissioner unpaid

---

1. Mr. Pound, RAM's president, has asserted his Fifth Amendment privilege and refused to answer questions concerning RAM's takeover of APX's business.

servicing fees that accrued from September 1, 1995 through January 15, 1996. To recover under a theory of unjust enrichment in Illinois, "plaintiffs must show that defendant voluntarily accepted a benefit which would be inequitable for him to retain without payment." *People ex rel. Hartigan v. E & E Hauling, Inc.,* 153 Ill.2d 473, 607 N.E.2d 165, 177, 180 Ill.Dec. 271, 283 (1992). Where a benefit is "conferred in the face of opposition and disinterest," relief under a theory of unjust enrichment is not available. *Knaus v. Dennler,* 170 Ill.App.3d 746, 525 N.E.2d 207, 210, 121 Ill.Dec. 401, 404 (5th Dist. 1988); *see also Behrstock v. Ace Hose and Rubber Co.,* 147 Ill.App.3d 76, 496 N.E.2d 1024, 1027–28, 99 Ill.Dec. 932, 935–36 (1st Dist.1986) (holding that *quantum meruit* recovery was not possible for plaintiff alleging that he was entitled to a salary increase where the defendant had expressly objected to the increase).

■ According to RAM, the servicing of the mortgages conferred a direct benefit upon the Commissioner which was not gratuitous. The record, however, indicates that the Commissioner expressly objected to RAM servicing the mortgages well before September 1995. I have previously held that the Commissioner had no role or authority regarding the Agreement between Midwest and RAM. *Williams v. National Housing Exchange, Inc.,* 949 F.Supp. 646 (N.D.Ill.1996). In addition, on January 18, 1995, the Commissioner and Continental directed Midwest to place twenty-four hour security guards outside of RAM's offices. Moreover, on March 8, 1995, the Commissioner and Continental filed a lawsuit asking the court to declare that RAM had no authority to act as servicer for the mortgages.

Nonetheless RAM argues that the Commissioner voluntarily accepted its servicing. In support of this argument, RAM first points to the temporary restraining order entered by Judge Baer.[2] The TRO, however, was a result of the Commissioner objecting to RAM servicing the mortgages by filing a lawsuit against RAM. After the TRO was entered, the Commissioner continued in its efforts to oust RAM from servicing the mortgages, the result of which was a preliminary injunction enjoining RAM from taking any action in any way concerning or relating to the mortgages.

RAM next points to certain segments of the deposition testimony of Mr. Rose, arguing that his testimony shows the Commissioner, through its agents Catherine S. Mulholland and George Piccoli, maintained contact, supervision, and interest in RAM's servicing work.[3] The few pages of deposition testimony cited by RAM do not indicate that the Commissioner accepted or acquiesced in RAM's servicing, and they do not raise a genuine issue for trial in light of the ongoing efforts of the Commissioner to oust RAM from servicing the mortgages. As receiver for National Heritage, the Commissioner had a valid interest in RAM's servicing of the mortgage, even while she vigorously opposed that servicing. RAM has not raised an issue of material fact as to whether the Commissioner voluntarily accepted its servicing, and therefore summary judgment for the Commissioner on Count I of RAM's counterclaim is granted.

---

**2.** Pursuant to the terms of the TRO, RAM was barred from destroying the mortgage files, from using funds related to the servicing unless approved by Midwest, from denying Midwest access to the files, from concluding transactions involving the mortgages that altered the rights of any party, from using Bond earnings to fund the litigation, and from withholding any payments due the trustee. *Williams v. National Housing Exchange, Inc.,*

No. 95 Civ. 1594(HB), Temporary Restraining Order (S.D.N.Y. May 11, 1995).

**3.** RAM also states that the preliminary injunction hearing record is "replete" with evidence of the Commissioner's involvement. Conclusory statements unsupported by specific facts are insufficient to overcome a motion for summary judgment. *Williams,* 949 F.Supp. at 649.

*Summary Judgment on Count II*

■ In Count II of its Counterclaim, RAM requests judgment against Midwest for payment of a 1% "pull fee" pursuant to the December 1994 Agreement between RAM and Midwest. Section 6(c) of the Agreement states:

c. In the event that this Subservicing Agreement is cance[ ]led or terminated by Servicer, Bondholder, Issuer or Trustee for whatever reason, Sub–Servicer shall be entitled to a one percent (1%) of the unpaid principal balance of the Bond loan portfolio prior to the turn over of loan files.

RAM argues that the Agreement was terminated by this lawsuit when the preliminary injunction was entered January 8, 1996. According to RAM, it is now entitled to the pull fee pursuant to section 6(c).

As I have previously held, NHE's December 19 appointment of Midwest as servicer was null and void, and therefore Midwest did not have authority on December 23, 1994 to appoint RAM as subservicer. *Williams,* 949 F.Supp. at 648. In *Williams,* neither the Commissioner nor Continental disputed that Continental appointed Midwest as mortgage servicer on January 13th, 1995. *Id.* Accordingly, the opinion states:

Midwest...did acquire the rights and powers of mortgage servicer on January 13th as a result of Continental's appointment. At that point, whether Midwest's original contract with RAM was revived or whether Midwest's actions impliedly ratified RAM as the subservicer need not be determined by the Court for purposes of this motion. *Id.* at 649.

Midwest now seeks summary judgment on the limited basis that Midwest rejected Continental's offer of appointment as servicer.

On February 23, 1995, Steven Nelson, chairman of Continental, sent Camden R. Fine, president of Midwest, a letter regarding appointment of Midwest as servicer. The letter states: "This will confirm your interim appointment, effective January 13, 1995, as the new Servicer under the Indenture and Servicing Agreement dated December 28, 1993...." (February 23, 1995 letter from Steven Nelson to Camden R. Fine). The letter includes an acknowledgment line for signature by Mr. Fine. Mr. Fine, however, never signed the letter. In addition, Mr. Fine said in his deposition that Midwest never acted as servicer for the mortgages. (12(M) ¶ 41). Midwest contends that it did not accept the offer of appointment as servicer, and that it remained involved with the mortgages only because, as a secured creditor of APX, it believed it was entitled to the servicing income regardless of any contractual relationship with RAM.

In response to Midwest's summary judgment motion, RAM submitted a letter written on January 18, 1995—two days after the effective date of the purported appointment—by Mr. Fine to Jesse Meer, who represented Continental,. In the letter, Mr. Fine states, "I appreciate the confidence you and the trustee showed in us by allowing Midwest Independent Bank to act as servicer of the NHE bond." (January 18 letter from Camden R. Fine to Jesse Meer). Mr. Fine also refers to Midwest as "your servicer," and states "[w]e look forward to working with you and the Trustee." (January 18 letter from Camden R. Fine to Jesse Meer). RAM additionally submitted deposition testimony of Thomas J. Rose, a manager for Midwest. When Mr. Rose was asked, "[h]ow much, over the whole time of the relationship...did [Midwest] receive under the sub-servicing agreement," Mr. Rose replied that, although he could not clearly answer the question without documentation, he thought not more than $85,000. (Rose Dep. at 37–38) Viewed in the light most favorable to RAM, it seems unlikely that Midwest would accept money from RAM *under the sub-servicing agreement* after declining the authority to act as servicer.

Although Mr. Fine did not sign the February 23 letter, Continental authorized Midwest to act as servicer effective January 13, 1994, and there is a genuine issue regarding whether Midwest was indeed acting as servicer with the authority of Continental. If Midwest was acting as servicer with the authority of Continental effective January 13, it would have had exclusive power under the Indenture to contract with a subservicer. As is noted in *Williams,*

> Section 6.01 [of the Indenture] clearly indicates that the subservicing agreement that Midwest entered with RAM is the exclusive domain and concern of Midwest and RAM. Neither the Commissioner nor Continental has any role in approving or disapproving of this contract. Thus, Midwest made the agreement with RAM solely on its own behalf, and any issue, obligations, or problems associated with that contract must be resolved between RAM and Midwest. *Williams,* 949 F.Supp. at 649.

Therefore Midwest could have ratified the December Agreement between Midwest and RAM on or after January 13, because pursuant to the Indenture it did not need Continental's permission to do so.[4] Once Midwest had the authority to act as servicer, it also had the exclusive authority to determine its relationship with RAM.

Midwest argues that nonetheless, it is entitled to summary judgment because its actions do not amount to ratification of the Agreement. According to Midwest, it had no intention to engage in a contractual relationship with RAM, but rather was acting as a secured creditor to protect the value of an asset—the NHE servicing—in which it had a secured interest. When asked whether Midwest could protect its security interest by becoming "involved in a servicing aspect of the mortgage loans for which APX had mortgage servicing

rights," Mr. Rose answered, "Absolutely!" (Rose Dep. at 90). There is ample evidence in the record that Midwest wanted to protect the assets in which it had a secured interest. As discussed above, however, when Mr. Rose was asked how much Midwest had received *under the Sub-servicing Agreement,* he answered that it was an amount not more than $85,000. (Rose Dep. at 37–38).

Midwest correctly points out that "[r]atification will not be implied...from acts or conduct which are as consistent with an intention not to ratify as to ratify." *Arthur Rubloff & Co. v. Drovers Nat'l Bank of Chicago,* 80 Ill.App.3d 867, 400 N.E.2d 614, 618, 36 Ill.Dec. 194, 198 (1st Dist. 1980). Looking at the facts in the light most favorable to RAM, however, Midwest was receiving payments from RAM pursuant to the Agreement, indicating an acceptance of benefits and terms of the Agreement that would be inconsistent with an intention not to ratify. "When a party accepts the benefits of an agreement with knowledge of the agreement, it ratified the agent's actions." *Martin v. Federal Life Ins. Co.,* 268 Ill.App.3d 698, 644 N.E.2d 42, 47, 205 Ill.Dec. 826, 831 (1st Dist.1994) (upholding jury verdict for plaintiff where jury could have found that, even though employee lacked authority to make employment agreement with plaintiff at the time of the agreement, employee later acquired that authority and never repudiated his promise). Since RAM has shown that there are genuine issues of material fact regarding whether Midwest had authority to ratify the Agreement, and regarding whether Midwest ratified the Agreement, summary judgment for Midwest with regard to the "pull fee" is denied.

### Conclusion

For the reasons discussed above, the Commissioner's motion for summary judg-

---

4. Midwest argues that I have previously held the Agreement was null and void, and that therefore the Agreement is incapable of ratification. In *Williams,* I held only that Midwest's December 23 appointment of RAM as subservicer was invalid because *at that time* Midwest had no authority to appoint a subservicer. *Id.* at 649. As discussed above, Midwest entered the Agreement with RAM solely on its own behalf.

ment on Count I of RAM's counterclaim is granted, and Midwest's motion for summary judgment on Count II of RAM's counterclaim is denied.